Walter W. STEFFEN,
Plaintiff–Appellant,

v.

MERIDIAN LIFE INSURANCE COMPA-
NY, and Meridian Mutual Insurance
Company, Defendants–Appellees.

No. 87–1059.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 1, 1988.

Decided Oct. 11, 1988.

Robert G. Barker, Barker, Barker & Silver, Indianapolis, Ind., Donna J. Brusoski, E.E.O.C., Washington, D.C., for plaintiff-appellant.

John T. Neighbours, Baker & Daniels, Indianapolis, Ind., for defendants-appellees.

Before CUDAHY and MANION, Circuit Judges, and WILL, Senior District Judge.*

MANION, Circuit Judge.

Walter Steffen sued Meridian Mutual Insurance Company (Meridian Mutual) and its wholly-owned subsidiary, Meridian Life Insurance Company (Meridian Life), under the Age Discrimination in Employment Act (ADEA). Steffen claimed that Meridian Mutual and Meridian Life (whom we will refer to collectively as "Meridian") demoted him because of his age and then later discharged him because of his age and in retaliation for exercising his ADEA rights. The district court granted summary judgment in Meridian's favor on Steffen's discriminatory demotion and retaliatory discharge claims. Steffen's discriminatory discharge claim went to trial and a jury ruled in his favor. The district court, however, granted Meridian judgment notwithstanding the verdict and, in the alternative, conditionally granted Meridian a new trial. Steffen appeals all three decisions of the district court. We affirm the district court's grant of summary judgment and judgment notwithstanding the verdict on the discharge claims, and reverse the district court's grant of summary judgment on the demotion claim.

I. FACTUAL BACKGROUND AND
PROCEEDINGS IN
DISTRICT COURT

On February 28, 1979, two weeks short of his 61st birthday, Steffen began working for Meridian at its Indianapolis, Indiana headquarters as a Senior Vice–President in charge of Meridian Life. Over the course of the next few years Steffen capably per-

---

* Honorable Hubert L. Will, Senior District Judge of the Northern District of Illinois, is sitting by designation.

formed his job and Meridian Life enjoyed considerable success. Nonetheless, on April 1, 1983, Meridian replaced Steffen as head of Meridian Life with a younger man, William Madren, who assumed the position of General Manager and Vice–President. Steffen continued on with the company as Senior Vice–President and was responsible for performing actuarial services.

Why Steffen was replaced as head of Meridian Life is the subject of considerable dispute. Meridian claims that Steffen's replacement was simply the result of an understanding between Steffen and Harold McCarthy, the President and Chief Executive Officer of Meridian Mutual, that Steffen was only going to work for Meridian on a short-term basis. McCarthy testified that Steffen and he had discussed Steffen's age during their initial employment discussions because McCarthy wanted to ascertain whether Steffen would be on the job long enough to direct Meridian Life through the initial phases of its new strategies and because McCarthy did not want to mislead Steffen about Meridian's pension plan, which excluded new hires older than 59. According to McCarthy, Steffen "indicated he intended to work four or five years, which, added to age 60, came up to his 65th birthday in my mind." Thereafter, McCarthy mailed Steffen a letter stating:

I view the broad, general assignment as being twofold:

1. Take a leadership role in helping us move the Life operations from the plateau we now seem to be occupying to a position where we will have doubled our size and premiums in the next five years.
2. Help in locating, training and fixing in place, a successor who could continue the direction of the Life insurance operations at the increased tempo we will hope to have achieved in the next four or five years.

Steffen wrote back accepting the position.

McCarthy claimed that his understanding that Steffen would step down on his 65th birthday was reinforced during the next few years. Steffen's first evaluation dated February, 1980 stated that "[Steffen]

knows he is here on a short-term basis and for a specific assignment." A 1981 file memorandum, which McCarthy testified was created cooperatively by Steffen and him, stated that in 1981 Steffen was expected to "help the President locate and hire the person we expect will head [Meridian Life] after 3/83." A January 25, 1982 performance evaluation prepared by McCarthy stated that one of Steffen's objectives at the time of being hired was to "[f]ind a successor and have him successfully functioning by March, 1983" and that "I'm sure [Steffen] hopes to continue with the company in some capacity after age 65. We've discussed an actuarial consultant relationship which may be both a necessary and good arrangement for both of us." Steffen himself interviewed potential replacements in 1981 and 1982.

In October, 1982, Steffen interviewed William Madren, the person who turned out to be his successor. Prior to this interview, Madren and McCarthy had discussions that led to what McCarthy described as "an understanding that we wanted to be married...." On October 6, 1982, McCarthy and Steffen discussed Madren and both agreed that Madren was an excellent candidate. But Steffen objected to the proposed date McCarthy set for Steffen's replacement by Madren, April 1, 1983. In an October 6, 1982 "note to file" McCarthy wrote:

I have talked from the very beginning about the five years of Walt's efforts which would result in our having his replacement on board and functioning by the end of that time. My reference to five years was based on the fact that Walt was 60 years of age at the time he came with the Company. What I overlooked was that he was near the end of his 60th year and, for all practical purposes, was 61 years old. As a result, I was seeing 65 as the end of this time frame, and he was seeing his age 66 as the end.

Steffen testified that October 6, 1982 was the first time that he was informed that he was going to be replaced after his 65th birthday. Steffen told McCarthy that

"I can't buy it." Steffen testified that he reminded McCarthy that when Steffen came to Meridian he "had accepted non-inclusion in the [Meridian] pension plan or no special arrangement because I had intended to work beyond age 65." Steffen then proposed that he be named president of Meridian Life and that Madren be employed as general manager under Steffen until Steffen retired when he was 70. When Steffen reiterated this suggestion at a later date McCarthy stated, "That's impossible." According to Steffen, he told McCarthy to think of the situation from Steffen's perspective and McCarthy responded, "When I am 65, I'll be ready to retire."

McCarthy formally offered Madren the position as the head of Meridian Life on November 15, 1982. In a draft speech to Meridian managers, McCarthy stated that Madren was replacing Steffen "by [Steffen's] 65th birthday, which happens to be in March." A Meridian newsletter stated, "Steffen ... will work with ... Madren in the transfer of responsibilities until March 31, ... Steffen's normal retirement date...."

While Steffen's objections did not stop McCarthy from replacing him as the head of Meridian Life, McCarthy did not have any problems with Steffen staying on to perform actuarial duties. On October 14, 1982, McCarthy wrote Madren stating:

> One of the problems we will have is in creating the right kind of structure and environment for Walt Steffen to continue working with us. As you and I both know, we need his services. I haven't come up with a good answer yet and am depending on you to help me find the answer since you must be satisfied and comfortable with whatever solution we find.

In November, 1982, McCarthy again wrote Madren stating:

> I would like you to help me in working out the position description for Walt Steffen and the relationship the three of us will have. Your handling of this relationship will probably be one of the most important tests of your ability to sur-

round the job and provide us with the leadership I feel you are capable of offering.

On March 31, 1983, Madren became General Manager and Vice–President for Meridian Life. Steffen continued on with Meridian Life as a Senior Vice–President performing actuarial duties. Meridian did not decrease Steffen's pay after the demotion. In fact, Steffen received a 5% pay raise. There is some dispute, however, over whether the size of his annual pay increases lessened. In any event, Steffen was not pleased with the realignment of responsibilities and contacted an attorney. His attorney informed him that under the ADEA Steffen was required to give the Equal Employment Opportunity Commission ("EEOC" or "Commission") notice of the alleged discrimination. On May 13, 1983, Steffen went to the EEOC's Indianapolis District Office. According to Steffen, an Intake Officer told him that he could either file a "formal complaint," which the EEOC would immediately investigate, or he could file an informal complaint by filling out an Intake Questionnaire, which would protect his right to bring an ADEA action if his private conciliation attempts were unsuccessful. Steffen then filled out the Intake Questionnaire in reliance upon the representation that it would preserve his right to bring suit.

### A. *Steffen's Discharge*

In September, 1983, Steffen left for a three-week combined business and pleasure trip to California and Hawaii. While Steffen attended the Pacific Insurance Conference in Hawaii, Daniel Lau, the President of Grand Pacific Life Insurance Company (Grand Pacific), asked him to perform an evaluation of Grand Pacific. Steffen, who had known Lau for over twenty years, spent the next twenty-four hours deciding whether to perform the evaluation. Steffen testified that in making the decision he balanced the following four considerations: 1) he and his wife were on vacation; 2) because Meridian was interested in acquisitions, he wanted to alert Meridian to a potential acquisition in the event that

Grand Pacific was up for sale; 3) because Grand Pacific had a large amount of flexible premium annuity reserves, he thought he could possibly find "some clever method they were using in developing this volume of business"; and 4) he wanted to talk with his wife about whether performing the work would be a conflict of interest with his duties at Meridian.

Meridian had a written conflict of interest policy that was distributed to its employees. The introductory provisions of this policy stated:

> The objectives of this policy are ...: [t]o emphasize the requirement to disclose actual or potential conflicts of interest;
>
> .    .    .    .    .
>
> No policy, however, can hope to spell out the appropriate ethical behavior for every situation confronting an employee. When in doubt as to the proper course of action, the employee should seek counsel through disclosing the circumstances in accordance with this policy.

Substantively, the policy provided:

> DEFINITION
> A "Conflict of Interest" is any circumstance that may cast doubt, or even the appearance of doubt, on an employee's ability to act with total objectivity with regard to the Company's interest.
>
> .    .    .    .    .
>
> POLICY GUIDELINES
>
> .    .    .    .    .
>
> 2. While not a complete list, the following constitute reportable conflicts of interest and/or violations of this Statement when involving an employee or any relative, spouse, or spouse's relative residing in the same household as the employee:
>
> .    .    .    .    .
>
> c. Being a director, officer, partner, consultant, or performing work or services for any person or enterprise doing business with, seeking to do business with, or competing with the Company.
>
> .    .    .    .    .

> k. Disclosing confidential information of a technical, financial, or business nature to any individual or enterprise not authorized by the Company.
>
> .    .    .    .    .
>
> RESPONSIBILITY
>
> .    .    .    .    .
>
> Each employee is responsible for remaining familiar with this Statement of Policy, for reporting any actual or potential conflicts or violations of this Statement, and for seeking assistance if questions requiring guidance develop.

The next day Steffen agreed to perform the evaluation. Steffen then met with Grand Pacific officials, reviewed company documents, and wrote a report (hereinafter "the Grand Pacific report") that evaluated the company and made suggestions as to how the company could improve its performance. Steffen then met with the Grand Pacific Executive Committee and submitted the report. Although he initially did not want to accept payment for the work because Mr. Lau was a friend, Steffen agreed to accept $1500 and the payment of his hotel expenses from Grand Pacific.

Steffen returned to Indianapolis during the last week of September. Within a few days, he contacted Peter Spoolstra, an Indianapolis actuary who did work for both Grand Pacific and Meridian Life. Steffen met with Spoolstra and gave him a copy of the Grand Pacific report.

At about the same time, Steffen and McCarthy also had a conversation concerning Steffen's trip to Hawaii. McCarthy asked Steffen why he did not submit reimbursement for his travel expenses to Hawaii. Steffen replied that he had won two tickets to the West Coast from a travel agency and then paid for the travel to Hawaii out of his own pocket pursuant to an arrangement he had with McCarthy when Steffen had traveled to Switzerland for another conference. Steffen did not mention that he had done consulting work for Grand Pacific.

McCarthy did not find out about Steffen's work for Grand Pacific until he was

told by a Meridian officer named David Scofield. Scofield had learned of Steffen's work from Spoolstra, the Indianapolis actuary to whom Steffen had given a copy of the Grand Pacific report. McCarthy then went to talk to Steffen. According to Steffen, he started to explain what he had done for Grand Pacific but McCarthy interrupted him stating, "We'll see about that." McCarthy claimed a different version of events. McCarthy stated that he asked Steffen whether he had prepared a written report and that Steffen replied that he had not.

The matter was then turned over to George Buennagel, Meridian's internal auditor. Thereafter, Steffen's work for Grand Pacific became the subject of a meeting between Buennagel and Daniel Evans, the Chairman of the Joint Audit Committee (JAC) of Meridian Life's Board of Directors. McCarthy and Meridian's internal counsel were also present at the meeting. Evans told Buennagel at that meeting to expect to prepare a report on the matter for the JAC's November 18 meeting.

On November 15, another meeting was held between Evans and Buennagel. McCarthy was also present at this meeting along with Meridian's internal and outside counsel. By this time, McCarthy had been able to obtain a copy of the Grand Pacific report. Buennagel testified that after viewing the report, "we ... knew we definitely had a conflict of interest" and that "Mr. Evans and I and other members of the discussion agreed we obviously had a significant actual conflict of interest that had not been disclosed." According to Buennagel, Evans told him "to go ahead and perform my investigation, verify what we had determined and how it violated the policy." Buennagel further testified that Evans "wanted to know my opinion, my recommendation, my conclusions, thus generating" the report.

Buennagel then prepared a report concluding that Steffen committed three violations of the conflict of interest policy. First, the report stated that Steffen failed to disclose his relationship with an actual or potential competitor even though Steffen had three opportunities to do so. Buennagel testified that the three opportunities to disclose were at the time Grand Pacific asked Steffen to do the work, the time McCarthy asked Steffen about his expenses on the trip, and the time when Steffen allegedly denied drafting a written report. Second, Buennagel's report stated that Steffen performed services for a competing company without Meridian's approval. These services, according to the report, included evaluating the profitability of certain products, recommending a Universal Life product similar to Meridian Life's product which Steffen had successfully developed at Meridian, recommending strategic and annual financial planning, and commenting on management structure. Buennagel's report stated that in Meridian's Legal Division's opinion "the operating territories of the two companies do not prevent the two from being competitors for growth in the national market now and that the two companies are obvious potential direct competitors in the future." Third, the report stated that Steffen disclosed confidential Meridian information concerning the interest spread differential on Meridian's Flexible Premium Annuity Plan product, by recommending that Grand Pacific develop a Universal Life product along the lines of Meridian Life's product, and by recommending that Grand Pacific use a specific software company to automate their system. Buennagel's report concluded that the policy violations warranted disciplinary action.

Buennagel presented his report to the JAC on November 18, 1983. The six members of the JAC reviewed the report and questioned Buennagel and McCarthy. The JAC then unanimously passed a resolution finding that Steffen had previously acknowledged his duty to remain familiar with the policy and to report any actual or potential conflicts, that Steffen had failed to disclose an actual or potential conflict of interest, that Steffen performed consulting services for an actual or potential competitor, and that Steffen had disclosed confidential information without Meridian's approval. Finding Steffen's violation of the policy to be deceptive and material, the

resolution instructed Chairman Evans to recommend to the Board of Directors that it take such disciplinary action as the Board deemed appropriate.

Evans reported the resolution and the underlying circumstances to a meeting of Meridian Life's Board of Directors. Board members then questioned McCarthy who told the Board that his relationship with Steffen had been irreparably damaged. Thereafter, as reflected in its minutes, "the Board unanimously resolved, on basis of the report of the Joint Audit Committee and the recommendation of [McCarthy], to accept the resignation of Mr. Steffen if offered, and if not offered ... to terminate the employment relationship between ... Mr. Steffen and Meridian...." Steffen was then terminated.

Three Board members testified as to why they voted to terminate Steffen's employment. One Board member testified as follows:

Q  Why did you support the action that had been proposed?

A  For two reasons.

One, I felt that there was no reason to doubt what Mr. Evans had said, and I felt that Mr. Steffen, as the senior vice president of Meridian Life, having acted in that fashion of doing some work as consultant or in some other capacity for a competing company, had made a serious error that was in violation of the practice and the professional statement or code of behavior.

But in my case even more importantly in my own thinking was that Mr. Steffen, for whatever reason, would have chosen to—well, not to disclose promptly and fully when asked all of the details, seemed to me that was so uncharacteristic of what I had grown to expect from his conduct that that was just as important as the first what I thought was breach of conduct.

Q  The first breach you identified as being the decision to do the work?

A  Well, yes, doing the work for the other life insurance company when he was a senior officer of Meridian Life; seemed to me that was wrong. And then to compound the difficulties, his not, when being specifically asked about it, just making a clean breast of what had happened right off the bat, I thought that was equally wrong.

Another Board member testified that the significant factors in his decision were that Steffen did not report doing the work for Grand Pacific "and the fact that when he was asked what he had done, he did not give an appropriate answer." A third testified that the factors behind his decision were that Steffen had failed to follow the conflict of interest policy, that Steffen denied preparing a written report, and that the incident raised questions concerning Steffen's loyalty as well as Steffen's communications with other Meridian executives.

On December 1, 1983, Steffen filed a charge of discrimination with the EEOC alleging that he had been demoted and then discharged because of his age. Steffen then filed a civil action against Meridian Mutual and Meridian Life. Steffen attempted to proceed on three claims against Meridian: (1) that Meridian violated 29 U.S.C. § 623(a) by demoting him because of his age; (2) that Meridian violated 29 U.S.C. § 623(a) by discharging him because of his age; and (3) that Meridian violated 29 U.S.C. § 623(d) by discharging him in retaliation for exercising his ADEA rights. The district court granted summary judgment in Meridian's favor on two of the claims. The district court held that Steffen's discriminatory demotion claim failed as a matter of law because Steffen did not file a timely charge of discrimination challenging his demotion. The district court held that Steffen's retaliatory discharge claim failed as a matter of law because he had not filed a charge with the EEOC alleging retaliation.

The case then proceeded to trial on Steffen's discriminatory discharge claim. Steffen did not claim that the Board or JAC members had a discriminatory animus. Rather, Steffen's case zeroed in on McCarthy. Steffen's theory essentially was that McCarthy had a discriminatory animus towards him because of his age and that "but

for" McCarthy's discriminatory animus, he would not have been fired. According to Steffen, McCarthy made sure that Buennagel would write an unfavorable report on Steffen and then, through his participation at the JAC and Board of Directors' meetings, McCarthy made sure that Steffen would be terminated. Steffen further claims that McCarthy's domination of the proceedings was evidenced by the fact that he was never given a chance to explain his version of the events to either Buennagel, the JAC, or the Board. He also pointed out that at the time of trial, none of the more than 570 Meridian employees was over age 65.

The jury returned a verdict in Steffen's favor. Finding Meridian's violation to be willful, the jury also awarded Steffen liquidated damages. Meridian then filed a motion for judgment notwithstanding the verdict, which the district court granted. According to the district court, even assuming that McCarthy had a discriminatory animus, there was insufficient evidence upon which a reasonable juror could conclude that "but for" McCarthy's involvement Steffen would not have been discharged. The only effect McCarthy had on the firing process, the court stated, was his alleged misrepresentation that Steffen denied preparing a written report for Grand Pacific. The district court concluded that this simply did not create a question of fact over whether the Board would have reached a different decision. The district court reasoned that Steffen's alleged misrepresentation was only one of the alleged failures to disclose that constituted an alleged violation of the conflict of interest policy. Furthermore, the district court stated, "no member of the Audit Committee or Board of Directors testified that that instance of denial alone had compelled his vote to terminate Steffen or had provided an independent basis for his decision to terminate Steffen...."

This appeal followed.

## II. ANALYSIS

### A. *Steffen's Demotion Claim*

The first issue we must address is whether the district court properly entered summary judgment in Meridian's favor on the ground that Steffen did not file a charge challenging his demotion until December 1st, 1983, more than 180 days after the alleged discriminatory demotion. At the outset, Meridian argues that we may sidestep this issue because the record does not contain substantial evidence to support Steffen's claim of discriminatory demotion. We disagree.

Meridian contends that the evidence shows, at most, that McCarthy and Steffen had a good-faith misunderstanding over when Steffen planned to step down from his position. This is a plausible view of the evidence. But it is not the only plausible view of the evidence. There is substantial evidence in the record that McCarthy focused on Steffen's chronological age, rather than any formal or informal understanding between Steffen and himself in determining Steffen's replacement date. Steffen testified that there was no understanding that he was going to retire on his 65th birthday. Moreover, one of McCarthy's own memos stated that Steffen and he had an understanding that Steffen would work for five years. That five-year period would have ended in February, 1984. The memo then states that McCarthy assumed that Steffen was leaving on his 65th birthday because McCarthy did not realize that Steffen was almost 61 years old at the time. Regardless of McCarthy's intentions, the ADEA does not allow an employer to subtract nearly a year off a five-year understanding simply because of an intervening 65th birthday.

Having concluded that there is sufficient evidence in the record to go to the jury on the discriminatory demotion issue, we must next decide whether Steffen satisfied the ADEA's charge-filing requirement. The ADEA provides that "[n]o civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the [EEOC]." 29 U.S.C. § 626(d). In a non-deferral state such as Indiana, *see Keitz v. Lever Brothers Co.*, 563 F.Supp. 230, 233–34 (N.D.Ind.1983), an employee

must file a charge within 180 days after the alleged discriminatory act occurred. 29 U.S.C. § 626(d)(1). The purpose of the charge-filing requirement is to provide the EEOC with sufficient information to notify an employer that it has been charged with discrimination and to provide the EEOC with the opportunity to investigate the alleged unlawful practice as well as to provide the EEOC with the opportunity to eliminate any unlawful practice through informal conciliation. *See Bihler v. Singer Co.*, 710 F.2d 96, 99 (3d Cir.1983); *see also Caldwell v. Nat'l Ass'n of Home Builders*, 771 F.2d 1051, 1054–56 (7th Cir.1985). Thus, "[i]n order to constitute a charge that satisfies the [statutory] requirement ..., notice to the EEOC must be of a kind that would convince a reasonable person that the grievant has manifested an intent to activate the Act's machinery." *Bihler*, 710 F.2d at 99. *See also Greene v. Whirlpool Corp.*, 708 F.2d 128, 130 (4th Cir. 1983), *cert. denied*, 464 U.S. 1042, 104 S.Ct. 707, 79 L.Ed.2d 171 (1984).

Steffen contends that the completed Intake Questionnaire he filed on May 13th, 1983, in and of itself, satisfied the charge-filing requirement. Steffen claims support for his position in the EEOC regulations which define a "charge" as "a statement filed with the Commission by or on behalf of an aggrieved person which alleges that the named prospective defendant has engaged in or is about to engage in actions in violation of the [ADEA]...." 29 C.F.R. § 1626.3. The regulations further provide that "a charge is sufficient when the Commission receives from the person making the charge either a written statement or information reduced to writing by the Commission that conforms to the requirements of [29 C.F.R.] § 1626.6." 29 C.F.R. § 1626.8(b). 29 C.F.R. § 1626.6 simply states that "[a] charge shall be in writing and shall name the prospective respondent and shall generally allege the discriminatory act(s)."

Steffen's Intake Questionnaire certainly contains enough information to satisfy the above regulations; it names Meridian as respondent and states that he was demoted because of his age. Contrary to Steffen's arguments, however, the EEOC's regulations make clear that, while a charge is "sufficient" if it names the respondent and generally alleges discrimination, not all documents containing such information are charges. There is no other way to explain the distinction in the EEOC's regulations between a "complaint" and a "charge." A "complaint" is defined to "mean information received from any source, *that is not a charge*, which alleges that a named prospective defendant has engaged in or is about to engage in actions in violation of the [ADEA]...." 29 C.F.R. § 1626.3 (emphasis added). As noted above, a charge is sufficient under the regulation if it names the respondent and generally alleges a discriminatory act. Thus, under these regulations, any document that names a prospective respondent and alleges a violation of the Act falls within the definition of either a complaint or a charge. The regulations, however, only provide that the Commission shall promptly notify a respondent that a *charge* has been filed. 29 C.F.R. § 1626.11. The only plausible reason why the EEOC would consider one communication of information to be a "complaint" and another to be a "charge" is that a "charge" is submitted under circumstances that would lead the EEOC to believe that the complaining party sought to "activate the Act's machinery." Moreover, there is no other plausible reason why the EEOC labels certain forms as "Intake Questionnaires" and other forms as "Charges of Discrimination."

In addition, we note that Steffen's interpretation of the regulations would raise serious questions as to whether the EEOC regulations defined the term "charge" so loosely as to relieve it of its statutory duties to notify employers and to engage in conciliation efforts. *See* 29 U.S.C. § 626(d). Under Steffen's interpretation of the regulations, virtually every completed Intake Questionnaire (and probably most phone messages) would fall within the definition of a charge. But the EEOC does not routinely treat Intake Questionnaires as charges. The fine print on the back of the form states that the "principal purpose" of

the form "is to solicit information to enable the Commission to avoid the intake of non-Title VII matters." (The EEOC's forms apparently lag behind its statutory authority.) The fine print then goes on to state that its "routine uses" are "to determine ... jurisdiction over *potential charges,* and to provide *pre-charge filing counseling....*" (emphasis added.) Moreover, the relevant decisionmakers at the EEOC plainly did not treat Steffen's Intake Questionnaire as a charge. The EEOC did not promptly notify Meridian that a charge had been filed or attempt conciliation, all as statutorily required. In fact, a December, 1983 entry in the EEOC logs stated that there were no active charges filed against Meridian.

■ Although we reject Steffen's overly-simplistic interpretation of the regulations, under the circumstances as alleged by Steffen we do not reject his argument that his Intake Questionnaire satisfied the charge-filing requirement.[1] The ADEA's charge-filing requirement was not intended to hold persons to elaborate pleading requirements or require that a person submit a document declaring an affirmative intention to activate the ADEA's procedures. *See Bihler,*

710 F.2d at 100 n. 8 (Congress "substituted the requirement of filing a charge for the more stringent requirement of notifying of intent to sue."). The ADEA is remedial legislation that the courts have refused to construe in a "hypertechnical manner" so as to defeat the Act's legislative purpose. *See Stearns v. Consolidated Management, Inc.,* 747 F.2d 1105, 1112 (7th Cir.1984). Thus, in determining whether the charge-filing requirement has been satisfied, the courts have scrutinized the circumstances under which a document is submitted so as not to let the title of the form triumph over substance. *See, e.g., Price v. Southwestern Bell Telephone Co.,* 687 F.2d 74, 79 (5th Cir.1982) (Intake Questionnaire is not "necessarily legally insufficient" to constitute a charge); *Rabzak v. County of Berks,* 815 F.2d 17 (3d Cir.1987) (letter seeking assistance treated as a charge); *Waiters v. Robert Bosch Corp.,* 683 F.2d 89 (4th Cir.1982) (mailed affidavit treated as a charge).

■ Under the facts as alleged by Steffen, it would be a needless triumph of form over substance to hold that his completed Intake Questionnaire did not satisfy the ADEA's charge-filing requirement. As

---

1. Steffen also claims that the district court's grant of summary judgment was improper because his December 1, 1983 charge cured any problem with his initial filing. Steffen relies on 29 C.F.R. § 1626.8(c), which provides that "[a] charge may be amended to clarify or amplify allegations made therein ...," and that any such amendment related to acts alleged in the original charge will relate back to the date the original charge was filed. This regulation plainly does not cover the present case. 29 C.F.R. § 1626.8(c) allows a *charge* to be amended to amplify or clarify allegations in a charge already filed. If Steffen's May 13th, 1983 Intake Questionnaire is not a charge, then there was no charge to be amended or clarified by the December 1st, 1983 charge.

We do note that in *Casavantes v. California State University,* 732 F.2d 1441 (9th Cir.1984), the Ninth Circuit held that an employee satisfied Title VII's charge-filing requirement when he filed an unverified Intake Questionnaire within the statutory time period for filing a charge and then filed a verified formal charge outside that time period. (Unlike the ADEA, Title VII requires a charge to be filed under oath or affirmation. *See* 42 U.S.C. § 2000e-5(b).) Relying on the EEOC regulations that allow a charge to be amended to cure

technical defects including the lack of verification, the court reached the "inescapable conclusion that the completed Intake Questionnaire, in the context of both the amendment procedures and the liberality to be ascribed to procedural requirements, is sufficient to constitute a charge." *Id.* at 1443. *Contra Proffit v. Keycom Electronic Publishing,* 625 F.Supp. 400, 403–04 (N.D.Ill.1985) (Shadur, J.) (holding that until a document is submitted under oath or affirmation there is no Title VII charge to be amended), *overruled on other grounds, Gilardi v. Schroeder,* 833 F.2d 1226 (7th Cir.1987). Aside from the verification requirement which has no relevance to this case arising under the ADEA, *Casavantes* is somewhat cryptic on the issue of whether it viewed a completed Intake Questionnaire, in and of itself, to constitute a charge or whether it was simply holding that the circumstances of that particular case warranted holding that the Intake Questionnaire was a charge. Given its citation to *Price v. Southwestern Bell Telephone Co.,* 687 F.2d 74, 79 (5th Cir.1982), for the proposition that a completed Intake Questionnaire is not necessarily insufficient to constitute a charge, we do not read *Casavantes* as holding that a completed Intake Questionnaire, in and of itself, satisfies the charge-filing requirement.

noted above, the information contained in the Intake Questionnaire contains sufficient information to satisfy the EEOC regulations concerning the sufficiency of charges. More important, Steffen made clear to the EEOC's Intake Officer that he intended to "activate the Act's machinery." Steffen was sent to the EEOC for the sole purpose of preserving his right to bring suit by complying with the charge-filing requirement. He communicated that purpose to the EEOC and then followed the EEOC's instructions on how to satisfy the charge-filing requirement. Under these circumstances, the Intake Questionnaire clearly gave the EEOC more than reasonable notice that, by filing the Intake Questionnaire, Steffen intended to "activate the Act's machinery." The problem in this case is that the EEOC informed Steffen that it would be treating the Intake Questionnaire as a charge but then failed to treat it as a charge. The EEOC's failure to act on a charge, however, does not bar a person from maintaining an ADEA action. *Stearns*, 747 F.2d at 1112; *Bihler*, 710 F.2d at 99 n. 7. As such, the district court improperly granted summary judgment to Meridian.

Finally, we note that the EEOC's handling of this matter does raise some serious inconsistencies that should be addressed by the EEOC. While we remain puzzled as to the source of the Intake Officer's distinction between "formal" and "informal" charges, the EEOC's position in this matter only compounds the confusion. The EEOC, which has appeared as amicus curiae on Steffen's behalf, has supported Steffen's contention that a completed Intake Questionnaire, in and of itself, constitutes a charge. As noted earlier, however, this is quite plainly not the position it takes in practice. The ADEA does not allow the EEOC to have it both ways. If a person files a charge, the EEOC is required to perform its statutory duties of employer notification and conciliation. The inconsistencies between what the Intake Officer told Steffen, how the EEOC treats Intake Questionnaires in practice, and what the EEOC argues on appeal have led to a situation that is unfair to both employees and

employers. We hope that in the future the EEOC will give better assistance to employees that will avoid needless disputes over what should be simple, uncomplicated procedures.

### B. *Retaliatory Discharge Claim*

The next issue Steffen raises is whether the district court properly granted Meridian summary judgment on Steffen's retaliatory discharge claim. The district court held that Steffen's retaliatory discharge claim failed as a matter of law because it did not fall within the scope of the charge Steffen filed on December 1, 1983. We agree.

■ ADEA claims are cognizable in a civil action if they are "like or reasonably related to the allegations of the charge and growing out of such allegations." *Jenkins v. Blue Cross Mutual Hospital Insurance, Inc.*, 538 F.2d 164, 167 (7th Cir.) (en banc) (quoting *Danner v. Phillips Petroleum Co.*, 447 F.2d 159, 162 (5th Cir.1971)), *cert. denied*, 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed. 2d 598 (1976); *see also Babrocky v. Jewel Food Co.*, 773 F.2d 857, 864 (7th Cir.1985). This "scope of the charge" requirement serves the very purposes of requiring a charge to be filed in the first place. As the court noted in *Babrocky*, 773 F.2d at 863, "[a]llowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to file a timely EEOC charge."

■ Here, Steffen's retaliation claims do not fall within the scope of the charge submitted to the EEOC. In filling out his charge, he checked the box marked "Other" and specifically wrote in "Age." He then complained in the body of the charge that he had been replaced by a younger man and later terminated, all because of his age. There is no mention of retaliation or any other words to that effect. Steffen apparently claims the charge's allegation that Meridian's stated reasons for its ac-

tions were pretextual allows a reasonable person to infer retaliation. This contention misses the mark by a wide margin. If Steffen believed the company's stated reasons were not pretextual he obviously would not have been claiming age discrimination. Equally wide of the mark is Steffen's contention that retaliation was reasonably related to his charge because his Intake Questionnaire noted, as requested on the form, that he had consulted with an attorney. Aside from the fact that the December 1, 1983 charge contained no such information, it is difficult to see how mentioning that counsel had been retained can somehow be equated with an accusation that that person's employer retaliated against him for exercising his ADEA rights. This is simply not a case where it can fairly be said that the charge alleges retaliation. *Compare Jenkins,* 538 F.2d at 168 (even though charging party only checked box marked "race," factual allegations in charge also fairly raised questions of sex discrimination). Steffen's retaliation claim injects an entirely new theory of liability into the case alleging unlawful activity of a much different nature than the age discrimination alleged in the charge. *See Ekanem v. Health And Hospital Corp.,* 724 F.2d 563, 573 (7th Cir.1983) ("A charge that a given wage is too low because of unlawful *retaliation* is not the same as a charge that a given wage is too low because of unlawful *race discrimination.*") (emphasis in original), *cert. denied,* 469 U.S. 821, 105 S.Ct. 93, 83 L.Ed.2d 40 (1984); *Jensen v. Board of County Commissioners,* 636 F.Supp. 293, 300 (D.Kan.1986) (retaliatory discharge claim not reasonably related to discriminatory discharge claim); *Tucker v. Harley Davidson Motor Co.,* 454

F.Supp. 738, 742 (E.D.Wis.1978) (same).[2] *See also Lowe v. City of Monrovia,* 775 F.2d 998 (9th Cir.1985) (plaintiff barred from maintaining sex discrimination action when charge only mentioned race discrimination), *amended,* 784 F.2d 1407 (9th Cir. 1986). As such, the district court properly entered summary judgment in Meridian's behalf on Steffen's retaliatory discharge claim.

### C. Steffen's Discriminatory Discharge Claim

To establish an ADEA violation, an employee is required to show that his employer took some adverse employment action, such as a discharge, against him on the basis of his age. *See Dorsch v. L.B. Foster Co.,* 782 F.2d 1421, 1423–24 (7th Cir.1986). The employee satisfies this burden if he proves that his age was a determining factor in the challenged decision in the sense that "but for" his employer's discriminatory animus he would not have suffered the adverse action. *Id.* An employee may attempt to meet this burden either by presenting direct evidence that age was a determining factor or by indirectly establishing the same fact through resort to the shifting burdens of production method articulated in *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See Mathewson v. National Automatic Tool Co., Inc.,* 807 F.2d 87, 89–90 (7th Cir.1986). After trial on the merits, however, "the particular method of proof used is irrelevant; the main focus is simply on the ultimate question whether plaintiff's age was 'a determining factor' in defendant's decision to terminate him." *Mathewson,* 807 F.2d at 90.

**2.** Steffen cites to a number of cases that have allowed a retaliatory discharge claim to proceed even though the underlying charge did not mention retaliation. *See, e.g., EEOC v. St. Anne's Hospital,* 664 F.2d 128, 131 (7th Cir.1981); *Gupta v. East Texas State University,* 654 F.2d 411, 414 (5th Cir.1981); *Grimes v. Louisville and Nashville Railroad Co.,* 583 F.Supp. 642, 649 (S.D.Ind.1984), *aff'd without published opinion,* 767 F.2d 925 (7th Cir.1985), *cert. denied,* 476 U.S. 1160, 106 S.Ct. 2280, 90 L.Ed.2d 722 (1986). These cases, however, all involved situations where the alleged retaliation arose *after* the

charge of discrimination had been filed or the employer was given clear notice from the EEOC that retaliation was at issue; thus, "a double filing ... would serve no purpose except to create additional procedural technicalities when a single filing would comply with the intent of Title VII." *Gupta,* 654 F.2d at 414. These cases are distinguishable from the present case where the alleged retaliatory acts occurred *before* Steffen's December 1, 1983 charge of discrimination was filed and Meridian was not given clear notice that retaliation was at issue.

We review a district court's ruling on a motion for judgment notwithstanding the verdict under the same standard applied by the district court. *La Montagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1410 (7th Cir.1984). The standard "is whether there is substantial evidence to support the verdict; *i.e.*, whether the evidence presented, combined with all reasonable inferences that may be drawn from it, is sufficient to support the verdict when viewed in the light most favorable to the party winning the verdict." *Mathewson*, 807 F.2d at 90. Thus, we may affirm the district court's grant of judgment notwithstanding the verdict only if there is not substantial evidence in the record to support plaintiff's contention that "but for" his age he would not have been discharged.

■ The district court held that, even assuming that McCarthy acted with a discriminatory animus, Steffen failed to present substantial evidence that McCarthy's involvement in the disciplinary process was a determining factor in his discharge. That the Board of Directors, none of whom Steffen claims harbored a discriminatory animus against him, would have independently determined that Steffen violated the conflict of interest policy is clear from the record. Steffen places great emphasis on the fact that there is a credibility issue over McCarthy's statement, which the Board and JAC accepted as true, that Steffen denied having prepared a written report. Steffen's alleged lie, however, was only one of the bases for the Board's conclusion that Steffen violated Meridian's rules. The Board found that Steffen disclosed confidential information and performed consulting work for a competitor without disclosure to or approval from Meridian. It is undisputed that Steffen did not tell anyone at Meridian about his work for Grand Pacific until specifically confronted by McCarthy over one month after his return.

Steffen also emphasizes that he presented evidence to support his view that Meridian and Grand Pacific did not compete and that the Meridian information contained in the Grand Pacific report was not "confiden-tial information." Boiled down to its essence, however, all this evidence tends to show is that the members of the Board and JAC defined the terms "competitor" and "confidential information" differently than Steffen's witnesses did. Furthermore, Steffen's position is significantly undercut by his own testimony that he viewed Grand Pacific as a potential acquisition and that he had doubts as to whether doing the report would constitute a conflict of interest. And one of Steffen's own witnesses testified that some of the Meridian information disclosed by Steffen could be considered confidential. Other attacks on the Board's conclusion only reinforce Meridian's position. For example, Steffen points out that the Chairman of the JAC testified that he would consider merely sending a copy of a Meridian life insurance contract to Grand Pacific to be a conflict of interest. The fact that the Chairman of the JAC took a very stringent view of company policy only buttressess the conclusion that the Board would have found a conflict of interest violation independent of McCarthy's involvement.

Steffen nonetheless argues that even if the Board would have found a conflict of interest violation absent McCarthy's involvement in the process, the jury still could have found that Steffen would not have been discharged absent McCarthy's involvement. Without a similarly situated younger employee to use as a measuring stick, this argument raises a difficult question. On one hand, the Board viewed Steffen's actions to be a serious breach of the conflict of interest policy even absent the disputed factual issue over whether Steffen lied to McCarthy. On the other hand, McCarthy was hardly a casual bystander in the whole process. But this difficult question is one we need not resolve because there is simply no substantial evidence in the record from which the jury could infer that McCarthy's involvement in the process was motivated by age animus.

To support his contention that McCarthy's involvement in the termination decision was motivated by age discrimination, Steffen relies primarily on the fact that there was evidence in the record to show

that he was discriminatorily demoted on the basis of his age. We agree that substantial evidence supports Steffen's claim that he was discriminatorily demoted. And evidence of prior discriminatory conduct can often support an inference that subsequent conduct was also motivated by a discriminatory animus. *See Mathewson*, 807 F.2d at 91; *see also Williamson v. Handy Button Machine Co.*, 817 F.2d 1290, 1295 (7th Cir.1987). But the evidence in this case fails to support any such inference. While McCarthy may have demoted Steffen because of his age, he still valued Steffen's continued presence with Meridian. McCarthy's January, 1982 memo indicated that McCarthy strongly approved of Steffen's continued employment with Meridian in an actuarial capacity after March of 1983. In two different letters to Madren, McCarthy emphasized that "we need his services" and that one of the important tests of Madren's leadership would be the satisfactory handling of the situation with Steffen. McCarthy then reassigned Steffen actuarial responsibilities commencing in April, 1985, with full knowledge that Steffen was over age 65 and with the belief that Steffen would be a valuable resource to the company. Moreover, while Steffen complains about the size of the increase, Steffen received a 5% pay increase in 1983. After Steffen's discharge, McCarthy wrote to Meridian's Personnel Department to have Steffen replaced "ASAP." When a satisfactory replacement was not found, Meridian had to contract out the work.

In light of these facts, it defies logic to conclude that, approximately six months after McCarthy placed Steffen into a position, McCarthy seized upon Steffen's work for Grand Pacific as a pretext to discharge him because of his age. In fact, our reading of the record is essentially no different from Steffen's own attorney. In response to questioning from the bench on this point, Steffen's counsel stated that the record does show that McCarthy honestly believed that Steffen could do good work for the company and, as long as Steffen was "retired" from the formal management structure of the company, McCarthy viewed Steffen's continued presence as an asset to the company. But, according to Steffen's counsel, as soon as Steffen hired an attorney and refused to take the discriminatory demotion lying down, McCarthy contrived to have him terminated. That is not, however, discrimination based on age. That is retaliation based upon the exercise of rights under the ADEA. Perhaps there was sufficient evidence to justify a finding of retaliation, but that question was not before the jury. The only question presented to the jury was whether Steffen's age was a determining factor in his discharge. Because the record does not contain substantial evidence to support the jury's verdict on this issue, the district court properly granted Meridian judgment notwithstanding the verdict.

## III.  CONCLUSION

In sum, we affirm the district court's grant of summary judgment on Steffen's retaliatory discharge claim and affirm the district court's grant of judgment notwithstanding the verdict on Steffen's discriminatory discharge claim. We reverse the district court's grant of summary judgment in Meridian's favor on Steffen's discriminatory demotion claim and remand for further proceedings consistent with this opinion. In view of the fact that the damages in this case appear to be limited to the relative size of Steffen's pay increase during the last year of his employment, we hope the parties will see to it to settle this dispute without the need for further proceedings.

The judgment of the district court is

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.