Sue Ann **SWANSON**, Plaintiff,

v.

**ALLSTATE INSURANCE COMPANY,**
Defendant.

No. 97 C 7480.

United States District Court,
N.D. Illinois,
Eastern Division.

June 15, 2000.

Jill A. Pignotti, The Collins Law Firm, Naperville, IL, Eugene K. Hollander, The Law Offices of Eugene K. Hollander, Chicago, IL, for Sue Ann Swanson.

Paul R. Garry, Timothy Alan Wolfe, Michael Irving Leonard, Meckler, Bulger & Tilson, Chicago, IL, for Allstate Ins. Co.

## MEMORANDUM OPINION AND ORDER

SCHENKIER, United States Magistrate Judge.

In this action, plaintiff Sue Ann Swanson asserts three separate claims arising out of her dissatisfaction with her employment relationship with defendant Allstate Insurance Company, and the termination of that employment relationship. In Count I of the amended complaint, Ms. Swanson alleges discrimination on the basis of gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended by the Civil Rights Act of 1991 ("Title VII"). In Count II, Ms. Swanson alleges that Allstate retaliated against her for opposing the alleged gender discrimination, in violation of Title VII. Finally, in Count III, Ms. Swanson alleges that Allstate discharged her because of a disability, in violation of the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA").

Allstate has filed a motion for summary judgment on all of Ms. Swanson's claims [doc. # 61–1].[1] Allstate asserts that it is entitled to judgment on Count I, because all but one of Ms. Swanson's gender discrimination claims are time-barred under Title VII, and Ms. Swanson has failed to offer facts that create a triable issue on

---

1. Pursuant to 28 U.S.C. § 636(c), all parties to this case have voluntarily consented to have a United States Magistrate Judge con- duct all proceedings in this case, including the entry of final judgment (*see* doc. ## 25–27).

that lone remaining claim. Allstate seeks summary judgment on Count II on the grounds that Ms. Swanson engaged in no protected complaints of gender discrimination, and that in any event, the undisputed facts show she suffered no adverse job action as a result of her complaints and that Allstate had a legitimate, non-discriminatory reason for taking the actions Ms. Swanson complains about. Finally, as for Count III, Allstate contends that it did not discriminate against Ms. Swanson in violation of the ADA because Ms. Swanson is not "disabled" within the meaning of the ADA, and even if she were qualified and disabled, Allstate did not violate any duty of reasonable accommodation.

After careful review of the parties' submissions, the Court grants Allstate's motion for summary judgment as to Counts I and III, but denies the motion as to Count II.[2]

## I.

Summary judgment is proper if the record shows that there is no genuine issue as to any material facts, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. ("Rule") 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. 2505; *Flip Side Productions,*

*Inc. v. Jam Productions, Ltd.*, 843 F.2d 1024, 1032 (7th Cir.), *cert. denied*, 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988).

In deciding a motion for summary judgment, the Court's sole function is to determine whether sufficient evidence exists to support a verdict in the nonmovant's favor. The Court must view all evidence in the light most favorable to the nonmoving party. *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987), and draw all reasonable inferences in the nonmovant's favor. *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir.1990). Credibility determinations, weighing evidence and drawing reasonable inferences are jury functions, not those of a judge when deciding a motion for summary judgment. *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. 2505. However, mere conclusory assertions, unsupported by specific facts, are not sufficient to defeat a proper motion for summary judgment. *Bragg v. Navistar Intern. Transp. Corp.*, 164 F.3d 373, 377 (7th Cir.1998) (summary judgment affirmed; "conclusory statements that the testing conditions were less favorable" to plaintiff than to male co-workers was insufficient to "affirmatively demonstrate [ ] that a genuine issue of fact exists" on the issue of disparate treatment); *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir.1985) ("conclusory statements in affidavits opposing a motion for summary judgment are not sufficient to raise a genuine issue material fact").

---

**2.** After the summary judgment motion was fully briefed, Ms. Swanson sought leave to amend the amended complaint to add a Count IV, alleging that Allstate retaliated against her for asserting rights under the ADA. On April 26, 2000, in an oral ruling, the Court denied the motion to amend for two reasons: (a) the motion came long after the close of discovery and during the pendency of the summary judgment motion, and thus was extremely untimely and, if granted, would inject delay and prejudice into the case (*see, e.g., Feldman v. American Memorial Life Ins. Co.,*

196 F.3d 783, 793 (7th Cir.1999); *Sanders v. Venture Stores, Inc.*, 56 F.3d 771, 773–74 (7th Cir.1995)); and (b) the proposed amendment was futile, because the alleged ADA retaliation claim was known to Ms. Swanson when she filed her ADA charge with the EEOC and thus could have been included in that charge—but was not. *See, e.g., McKenzie v. Illinois Department of Transportation*, 92 F.3d 473, 481–83 (7th Cir.1996); *Steffen v. Meridian Life Ins. Co.*, 859 F.2d 534, 544–45 (7th Cir.1988).

All properly supported material facts set forth in either parties' statement (*i.e.,* Def's. Facts or Pl.'s Add'l Facts) are deemed admitted unless properly controverted by the opposing party. UNITED STATES DIST. COURT, N. DIST. OF ILL. LR 56.1; *see also Corder v. Lucent Technologies, Inc.,* 162 F.3d 924 (7th Cir.1998); *Flaherty v. Gas Research Inst.,* 31 F.3d 451, 453 (7th Cir.1994); *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 921–22 (7th Cir.1994). In order to "properly controvert" a movant's fact statement, the nonmovant must cite to evidence; a mere denial of supported factual assertion is insufficient to create a genuine dispute. *Flaherty,* 31 F.3d at 453. That said, the Court now turns to the undisputed material facts.

## II.

### A. The parties.

Plaintiff, Sue Ann Swanson, is a female individual residing in the State of Illinois. Defendant, Allstate Insurance Company, is an Illinois insurance corporation, doing business worldwide by providing a variety of insurance related services (Def's. Facts ¶ 1–2). Allstate employed plaintiff as an attorney from 1980 until February 24, 1998 in Allstate's corporate office in South Barrington, Illinois (*Id.* ¶ 2).

### B. Ms. Swanson's Initial Employment at Allstate.

For the first six and one-half years of her employment with Allstate, from June 1980 through 1986, Ms. Swanson worked in Allstate's house counsel's office in downtown Chicago (Pl.'s Add'l Facts ¶ 4). In the last evaluation she received at that office, covering the period from January to October 1986, Ms. Swanson was rated by their supervisor as "significantly exceeding" expectations, and was recommended for promotion from Attorney B to Trial Attorney, Civil (*Id.* ¶ 7). In late 1986, Ms. Swanson was transferred to Allstate's Commercial Insurance Legal Division in South Barrington, Illinois (Def.'s Facts ¶ 34 (citing Ex. A, Swanson Dep. at 195)). With that transfer, Ms. Swanson began reporting to David Brodnan, who then was heading up the Allstate Business Insurance Law Division (Def.'s Facts ¶ 35; Pl.'s Add'l Facts ¶ 8). There is no allegation that this transfer was punitive in any way; rather, it is agreed that the reason for Ms. Swanson's transfer was that Mr. Brodnan wanted to have an attorney with a litigation background to handle arbitrations (Pl.'s Add'l Facts ¶ 9).

### C. Swanson's Dealings with Mr. Brodnan.

Ms. Swanson's assignment to work with Mr. Brodnan at the South Barrington Office originally was intended to last only six months, with Ms. Swanson then to rotate to a different Allstate office (Def.'s Facts ¶ 34). However, in March 1987, Mr. Brodnan hired Ms. Swanson—at her request—to become a full-time member of the business insurance legal staff as an Assistant Counsel II (Def.'s Facts ¶ 36).

Mr. Brodnan formally reviewed Ms. Swanson's job performance for the first time in February 1988. At that time, Mr. Brodnan stated that Ms. Swanson's "performance meets expected level for position" (Def.'s. Facts ¶ 37), a rating that Ms. Swanson believed was fair (*Id.* ¶ 38).

In November 1988, Mr. Brodnan prepared another written evaluation, which again stated that Ms. Swanson's performance "meets" expectations (Def.'s Facts ¶ 39). Mr. Brodnan complimented Ms. Swanson for having "done a good job in building her legal knowledge in these new areas" (*id.*) commented favorably on her client dealings (Pl.'s Add'l Facts ¶ 23), and was highly complimentary about Ms. Swanson's professionalism (Def.'s Ex. 9). Mr. Brodnan also stated that "while we are dependent on others to help us uncover and develop facts, Sue does not move this process as quickly as she could," and that she needed to increase her product knowledge in order to be assigned "com-

plex problems with high onset exposure" (*Id.*). Ms. Swanson signed the November 1988 evaluation, and did not make any comments taking issue with either the specific assessments of her performance or the overall rating she received (*Id.*).

Mr. Brodnan next reviewed Ms. Swanson in August 1989, and again gave her an overall performance rating of "meets" expectations (Def.'s Facts ¶ 41). Mr. Brodnan noted that Ms. Swanson's oral communication skills were not as strong as her writing skills, and that she needed to improve her productivity (*Id.*). Mr. Brodnan noted that Ms. Swanson had achieved several good results that had been praised by some clients, but that other clients had found her too inflexible and adversarial (Def.'s Facts ¶ 42). Mr. Brodnan complimented Ms. Swanson's business knowledge, legal ability, problem solving, and professionalism. However, he also noted that Ms. Swanson's level of productivity and oral communication skills still needed to be improved; that she needed to work better with co-counsel; and that she needed to "soften her presentation to her clients" (Def.'s Facts ¶ 41). This time, Ms. Swanson commented on the evaluation, complaining that she could have addressed Mr. Brodnan's concerns had she been told about them earlier. But Ms. Swanson not quarrel with either the criticisms or the overall rating as "meets" expectations. Rather, Ms. Swanson stated that she "hope[d] to improve in all Mr. Brodnan's areas of concern" (Def.'s Ex. 10 at SWAN 00200).

Mr. Brodnan next evaluated Ms. Swanson in May 1990 (Def.'s Facts ¶ 45). In that evaluation, Mr. Brodnan commented that Ms. Swanson had made "substantial improvement in areas noted in her [1989 evaluation]" (*Id.*). In addition, Mr. Brodnan noted that at his recommendation, Ms.

Swanson had received a performance bonus for "excellent work" in achieving an unexpectedly favorable arbitration result (*Id.*). Nonetheless, Mr. Brodnan's evaluation again rated Ms. Swanson as "meeting expectations" (*id.*); Mr. Brodnan did not explain why she failed to receive a higher rating (Pl's. Add'l Facts ¶ 46). For the first time, Ms. Swanson objected to the rating she received from Mr. Brodnan. In a lengthy memorandum, Ms. Swanson complained that she should have been promoted or at least rated as "exceeding" expectations, and that she had better credentials than others who had been promoted—both men and women (Def.'s Facts ¶ 47).

In February 1991, Mr. Brodnan evaluated Ms. Swanson, and again rated her performance as "meets expected level for position" (Def.'s Facts ¶ 49). Despite making no change in her overall rating, Mr. Brodnan praised Ms. Swanson for doing "a fine job during this review period," and he recommended her for promotion to Assistant Counsel III (*Id.;* Pl.'s Add'l Facts ¶ 55). And, in fact, Ms. Swanson was promoted to that position, effective March 1, 1991 (Def.'s Facts ¶ 49). Ms. Swanson did not complain at that time about Mr. Brodnan's decision to continue to evaluate her performance as "meeting" expectations (Def.'s Facts ¶ 50).

In late 1991, Mr. Brodnan yelled at Ms. Swanson in a hallway in front of another employee for being 15 minutes late to work (Def.'s Facts ¶ 51). Ms. Swanson complained about Mr. Brodnan's conduct (Def.'s Facts ¶ 9), and promptly sought a transfer out of Mr. Brodnan's department (*Id.* ¶ 51), which was not granted. At the time, Ms. Swanson believed that she had been discriminated against by Mr. Brodnan on the basis of gender (Def.'s Facts ¶¶ 9, 51).[3]

---

**3.** Ms. Swanson attempts to create a fact dispute about this point by asserting that her 1991 complaint about Mr. Brodnan was not "necessarily" based on gender (Pl.'s Resp. to Def.'s Facts ¶ 9). However, that assertion is contradicted by Ms. Swanson's own testimony that when she complained in 1991, "in the back of my mind something was telling me that [Mr. Brodnan] just thought that a man was better for the position than a woman"

In February 1992, Mr. Brodnan evaluated her once again. In that evaluation, Mr. Brodnan observed that with her promotion, Ms. Swanson had additional responsibilities, and that "her work generally has been good and timely" (Def.'s Facts ¶ 52). However, Mr. Brodnan also had criticisms of Ms. Swanson's performance and conduct: he stated that Ms. Swanson needed to work more independently on certain matters and have "a better team attitude" (*Id.*). Mr. Brodnan again gave Ms. Swanson a rating of "meets" expectations (*Id.*). Ms. Swanson made written comments objecting to this rating and (for the first time) to the level of her merit pay increase (Def.'s Facts ¶ 53). Ms. Swanson expressed her disagreement with Mr. Brodnan's criticisms, and commented on "the past difficulties we have experienced in our working relationship" (Def.'s Facts ¶ 53).

Those difficulties continued into the next evaluation period. On February 4, 1993, Mr. Brodnan evaluated Ms. Swanson and gave her an overall performance rating of "performance meets expected level for position" (Def.'s Facts ¶ 54). Incorporated into the evaluation was a form titled "Empowered Knowledge Worker," that evaluated business insurance employees in 18 separate categories of leadership imperatives. Ms. Swanson had filled out narrative comments and given herself grades, and then submitted the form to Mr. Brodnan. Mr. Brodnan discussed it with her and requested that Ms. Swanson lower some of the grades she had given herself (Def.'s Facts ¶ 54; Pl.'s Add'l Facts ¶¶ 73–74). In particular, Mr. Brodnan required Ms. Swanson to insert a statement in the comments section that "she needs to improve her interpersonal and diplomatic skills. She must become more agreeable and tactful and less assertive and inflexible" (Pl.'s Add'l Facts ¶ 73). At the time, Ms. Swanson felt that those actions by Mr. Brodnan were discriminatory (*Id.* ¶ 75).

### D. Ms. Hoffman's Supervision of Ms. Swanson.

In August 1993, Mr. Brodnan assigned Nancie Hoffman the responsibility for supervising three attorneys within the reinsurance collection area of the Business Insurance Law Division: Ms. Swanson, Paul Ryske and John Noone (Def.'s Facts ¶ 55). This change in supervision did not result in a reduction in Ms. Swanson's complaints.

In October 1993, a dispute arose between Ms. Hoffman and Ms. Swanson, when they had words about Ms. Swanson reporting to work after the designated 8:30 a.m. starting time (Def.'s Facts ¶¶ 56–57; Pl.'s Add'l Facts ¶ 101). This occasioned a request by Ms. Swanson for a transfer out of the Business Insurance Law Division in October 1993 (Pl.'s Facts ¶ 101). Ms. Swanson repeated this request in a December 10, 1993 memorandum entitled "REQUEST FOR TRANSFER DUE TO LONG–STANDING DISCRIMINATION" (Def.'s Facts ¶ 58) (capitalization original). Ms. Swanson admits that in this memorandum, she complained of gender discrimination by Mr. Brodnan (*Id.* ¶ 10). Pursuant to this request, Mr. Brodnan and Ms. Hoffman were able to arrange an assignment for Ms. Swanson to the Reinsurance Administration (ReAd) Department beginning January 1994 (*Id.* ¶¶ 59, 61).

In February 1994, Ms. Hoffman provided Ms. Swanson with an evaluation of Ms. Swanson's performance for the period of March 1993 to March 1994 (Pl.'s Add'l Facts ¶ 91). In that evaluation, Ms. Hoffman noted that Ms. Swanson had reported to her only from August 1993 until January 1994, and that she had been reassigned to ReAd "in an effort to meet her request to transfer out of the legal department" (Def's. Facts ¶ 61).

As had Mr. Brodnan, Ms. Hoffman provided a positive assessment of certain aspects of Ms. Swanson's performance.

(Def.'s Facts, Ex. A (Swanson Dep. 321)). In the face of this testimony, Ms. Swanson's naked assertion in her response to the contrary does not create a *genuine* issue of fact.

However, Ms. Hoffman commented on some of the same types of problems that Mr. Brodnan had observed. While Ms. Hoffman was aware of a history of problems between Mr. Brodnan and Ms. Swanson (Pl.'s Add'l Facts ¶ 94), her comments reflected observations during the period she personally supervised Ms. Swanson. Ms. Hoffman wrote that "[Ms. Swanson] continues to have very serious problems in her relationships and dealings with co-workers. In the last four months since I have been supervising Sue, I have at least four instances [of] very time consuming office disruptions [that] have occurred due to Sue's apparent inability to accept decisions, directions and personality of others" (Def's. Facts ¶ 63). Moreover, Ms. Hoffman expressed a criticism not previously made by Mr. Brodnan: Ms. Swanson sometimes took a "strict construction" of the law that, according to Ms. Hoffman, "sometimes leads to a failure to fully consider the business and/or legal purposes behind the statute or regulation" (Def.'s Facts ¶ 62). Ms. Hoffman gave Ms. Swanson an overall rating of "meets expectations" (*Id.* ¶ 63).

Ms. Swanson provided a detailed written rebuttal to this evaluation, rejecting Ms. Hoffman's criticisms as "spurious" and "unfounded" (Def.'s Facts ¶¶ 64, Ex. 20 at SWAN 00166). In that response, Ms. Swanson also repeated her criticisms of Mr. Brodnan, and suggested that she was receiving negative evaluations due to her gender: "I'm an able and competent attorney, but the strength of my personality is not appreciated. Yes, I speak my mind, voice my opinions whether popular or not. I apparently am being asked to change my personality and character to conform to someone else's perception of what a female attorney should be" (*Id.* ¶ 65).[4]

**E. Ms. Swanson's Work in the ReAd Department.**

In January 1994, Ms. Swanson moved to the ReAd Department, where she reported to Frank Milazzo. Although Ms. Swanson had sought a transfer (Def.'s Facts ¶ 58), and had not indicated that a transfer to ReAd was unacceptable, Ms. Swanson had not specifically asked to be transferred to ReAd (Pl.'s Add'l Facts ¶ 120). Ms. Swanson construed the assignment to ReAd as being in retaliation for making a complaint of discrimination (*Id.* ¶ 121).

Ms. Swanson worked in ReAd from January 1994 to January 1995 (Def.'s Facts ¶¶ 13, 72). During that time, Ms. Swanson reported to Frank Milazzo: she received work from him, reported back to him the results of her work, and received evaluation comments from him (Def.'s Facts ¶ 72). Ms. Swanson liked, trusted and respected Mr. Milazzo, and did not accuse him of discrimination (Def.'s Facts ¶ 74).

However, Ms. Swanson's regard for Mr. Milazzo did not result in a trouble-free tenure in ReAd. In the mid-year review in 1994, Mr. Milazzo told Ms. Swanson she had no future in ReAd (Pl.'s Add'l Facts ¶ 126)—an assessment that Ms. Swanson does not ascribe to discrimination. That led Ms. Swanson to request a transfer back to the legal division (*Id.* ¶ 127), a request that she was convinced to withdraw when Mr. Milazzo assured Ms. Swanson that her work was appreciated, and she would be rewarded for it (*Id.* ¶ 128).

On March 17, 1995, Mr. Milazzo signed Ms. Swanson's evaluation for the period of January 1994 to January 1995, and gave her an overall rating of "meets" expecta-

---

4. Ms. Swanson claims that Ms. Hoffman should not have given a male attorney, Mr. Ryske, a higher overall rating than Ms. Swanson received (Pl.'s Mem. at 9–10). But Ms. Swanson admits that while Ms. Hoffman ranked her competitively with Mr. Ryske in many job areas (Pl.'s Add'l Facts ¶ 98), Ms. Hoffman rated Mr. Ryske as superior in a number of areas, including interpersonal skills, communication and teamwork (*Id.* ¶ 99). Ms. Swanson has offered no evidence that Ms. Hoffman's more favorable assessment of Mr. Ryske and less favorable assessment of Ms. Swanson (even if incorrect) was based on gender.

tions for the position (Def.'s Facts ¶ 75). In that evaluation, Mr. Milazzo wrote that:

> "the above evaluation is based upon Sue's technical abilities and the resultant accomplishments. However, during the year, there were at least three separate occasions where there were confrontational 'flare-ups' with various members from the ReAd teams. These flare-ups were unprofessional, disruptive and unacceptable in a team environment. Disagreement and criticism are part of any relationship, however, Sue had difficulty in dealing with criticism and/or differences of opinion. As a result, relationships with team members suffered."

(*Id.*) Mr. Milazzo concluded that, "Sue must work on the development of her interpersonal skills and must strive to strengthen internal customer relationships. This is imperative for success under a team environment. It should be pointed out that this matter was first discussed with Sue at a mid-year checkpoint meeting" (*Id.*).

Ms. Swanson vigorously disputed these criticisms of her performance, and the rating she received from Mr. Milazzo (Def.'s Facts ¶ 80; Pl.'s Add'l Facts ¶ 151). Ms. Swanson made specific reference to her written complaint in December 1993 that Mr. Brodnan had discriminated against her based on gender, and asserted that her assignment to ReAd was "merely an artifice employed by Mr. Brodnan ... to give the illusion that I was being reviewed by another department" (*Id.*) Ms. Swanson claimed that Mr. Milazzo's criticisms were "fictitious," and merely reflected Mr.

Brodnan's "ongoing disapproval" of her assertiveness (Def.'s Facts ¶ 81). Ms. Swanson admits that her response to the Milazzo evaluation "lack[ed] diplomacy" (*Id.* ¶ 83).[5]

Because the evaluation was delivered in March 1995, after Ms. Swanson had returned to the legal group, certain portions of the evaluation list "goals" were added by Ms. Hoffman in the legal group (Def.'s Facts ¶ 79). However, there is no indication on the evaluation of any input or direction from Mr. Brodnan. Indeed, by the time of the March 1995 evaluation, Mr. Brodnan was no longer employed at Allstate, having retired in January 1995 (Def.'s Facts ¶ 19).[6]

### F. Ms. Swanson's Return to the Business Insurance Legal Department in 1995.

Ms. Swanson returned to the Business Insurance Law Department in January 1995. As a result of Mr. Brodnan's retirement, Ms. Swanson reported to Jim Sporleder, who then was responsible for the department (Def.'s Facts ¶ 76).

There apparently had been some previous tension between Mr. Sporleder and Ms. Swanson, although the extent of it is somewhat in dispute—Allstate says that the two of them agreed in December 1993 not to talk other than to say "hello" when passing in the hallway, and Ms. Swanson says Mr. Sporleder stopped talking to her in December 1993 and refused to speak with her in 1994 (Pl.'s Add'l Facts ¶ 112 and response thereto). In any event, when Ms. Swanson returned to the depart-

---

5. Ms. Swanson states that the response was nonetheless "tactful" (Pl.s' Resp. to Def.'s Fact ¶ 83), an assertion that is difficult to fathom not only in light of the language Ms. Swanson employed in her response but also given her admission that the response lacked diplomacy. "Diplomacy" commonly defined as "skill in handling affairs without arousing hostility," and as being synonymous with "tact." See WEBSTER'S COLLEGIATE DICTIONARY 327 (10TH ED.)

6. In her summary judgment papers, Ms. Swanson attempts to create a genuine dispute as to whether in fact Mr. Milazzo truly was the one who evaluated her, and whether Mr. Brodnan in fact was the person behind that evaluation (Pl.'s Add'l. Facts ¶¶ 124–125; Swanson Dep. 559–61). For the reasons explained below (*see* pp. 966–67, *infra*), the Court concludes that Ms. Swanson has failed to offer evidence sufficient to attribute any gender animus by Mr. Brodnan to the evaluation she received from Mr. Milazzo.

ment in 1995, Mr. Sporleder convened a meeting with Ms. Swanson and Ms. Hoffman to assure Ms. Swanson that under his leadership she would have a "fresh start" (Def.'s Facts ¶ 77). Ms. Swanson was not reassured: she expressed her distrust of Ms. Hoffman, and her "reservations" about Mr. Sporleder (*Id.* ¶ 24).

It did not take long for disputes between Ms. Swanson and Allstate to reach a boiling point. In January 1995, Ms. Swanson asked Mr. Sporleder if she would receive a promotion to Associate Counsel (Pl.'s Add'l Facts ¶ 141). The parties dispute whether Mr. Sporleder told Ms. Swanson he needed to wait for Mr. Milazzo's review before making a decision, which Allstate denies (Pl.'s Add'l Facts ¶ 141). But, it is undisputed is that Ms. Swanson in fact had not received a promotion by the time of the evaluation in March 1995; at that time received a "meets expectations" rating; and was not promoted thereafter (Pl.'s Add'l Facts ¶ 148). Ms. Swanson claims that this evaluation did not affect her promotion, because Mr. Sporleder already had decided not to promote her (*see* Pl. Resp. to Def.'s Facts ¶ 25; Pl.'s Mem. 10–11). But Ms. Swanson has created no genuine fact dispute on this issue, because she offers only her denial (and no evidence) to rebut Mr. Sporleder's sworn testimony that while he did not expect to promote Ms. Swanson, no final decision was made until after the Milazzo evaluation (Def.'s Facts, Ex. F, ¶¶ 7–9). Moreover, Ms. Swanson admits that Mr. Sporleder, as department head, had the authority to decide whether to promote Ms. Swanson, and that she does not accuse him of harboring any gender-based animus (Def.'s Facts ¶ 16).

On March 30, 1995, Ms. Swanson met with Mr. Milazzo to discuss the evaluation: Ms. Hoffman also attended, for purposes of continuity and transition since Ms. Swanson had returned from ReAd to Legal (Def.'s Facts ¶ 86). That meeting was adjourned, and later that day, Ms. Swanson met with Mr. Sporleder and Ms. Hoffman (Pl.'s Add'l Facts ¶¶ 152–53). The parties differ about precisely what was said at the meeting, but it is clear that Mr. Sporleder was not happy about the tenor of the conversation, and expressed concern about discord resulting from Ms. Swanson's complaints of discrimination (Pl.'s Add'l Facts ¶¶ 153–55 and Defendant's Response).

Shortly after this meeting, Ms. Hoffman recommended that Ms. Swanson should be offered a severance package and, if she refused it, that she should be fired (Pl.'s Add'l Facts ¶ 157). On April 4, 1995, Ms. Hoffman wrote a memo indicating that a member of Allstate's litigation department, Jon McKay, had expressed the view that a termination of Ms. Swanson could not be justified, and Ms. Hoffman then suggested a meeting with Allstate's general counsel to discuss the matter (Pl.'s Add'l Facts ¶ 159).

However, before any such meeting occurred, Ms. Swanson and Ms. Hoffman became embroiled in another dispute: Ms. Hoffman complained that Ms. Swanson had failed to keep her apprised of business contacts with certain senior Allstate officers, which—according to Ms. Hoffman—put her in a highly embarrassing situation (Def.'s Facts ¶ 87; Pl.'s Add'l Facts ¶ 164). Ms. Swanson did not dispute she had failed to keep Ms. Hoffman apprised (Pl.'s Add'l Facts ¶¶ 161–62), but expressed the view that she had no obligation to do so (Def.'s Facts ¶¶ 87–88). Ms. Hoffman, on the other hand, told Mr. Sporleder that she viewed Ms. Swanson's conduct as insubordinate (Def.'s Facts ¶ 88 (*citing,* Ex. F, Sporleder Affidavit at ¶ 15)).

Mr. Sporleder agreed with Ms. Hoffman. As a result of this event, Ms. Swanson received a "Job–In Jeopardy (JIJ)" notice (Pl.'s Add'l Facts ¶ 172). The decision to issue this JIJ notice was a collaborative one, reached by Mr. Sporleder, Ms. Hoffman, and the Allstate Human Resources Department (Pl.'s Add'l Facts ¶ 180). Mr. Sporleder had not previously

placed anyone on a JIJ, and has not done so since (*Id.* ¶ 181).

A JIJ notification is a performance management tool which can be utilized to address poor job performance or inappropriate conduct (Def.'s Facts ¶ 89). The JIJ notification informed Ms. Swanson of the requirements that her "demeanor shall at all times remain professional, courteous and respectful of others," and that she "follow all proper directives and requests of [her] immediate and ultimate supervisors" (*Id.* ¶ 90). In the JIJ, Allstate offered to provide Ms. Swanson training in interpersonal skills (Def.'s Facts ¶ 94). The issuance of the JIJ had no immediate, quantifiable effect on her employment position with Allstate: her title, duties, salary and benefits were unaffected, she was not suspended, and her ability to transfer was not altered (Def.'s Facts ¶¶ 96–97).[7] However, Ms. Swanson was informed in the JIJ notification that the requirements imposed "will remain in effect indefinitely, and any unexcused departure from them will result in termination of your employment" (*Id.* ¶ 93).

After receiving this JIJ, Ms. Swanson was unable to function at work or home (Pl.'s Add'l Facts ¶ 185). She experienced physical and emotional pain and trauma (*Id.* ¶ 186), as well as clinical depression (*Id.* ¶ 188). She also exhibited "paranoid delusional material about her supervisors" (Def.'s Facts, Ex. J. 9 at L0 31). On April 11, 1995, shortly after receiving JIJ notice, Ms. Swanson left work and did not return thereafter (Def.'s Facts ¶ 95).

### G. Ms. Swanson's Leave of Absence.[8]

Effective April 11, 1995, Ms. Swanson was granted an extended leave of absence

from her position as an Assistant Counsel III by Allstate (Def.'s Facts ¶ 105). She remained on leave until the time of her termination nearly three years later on February 24, 1998 (*Id.* ¶¶ 174–175). Ms. Swanson's leave of absence included the use of her accumulated vacation time, followed by a paid illness allowance that ran through August 31, 1995 (Def.'s Facts ¶ 105). When Ms. Swanson's paid illness allowance expired in August 1995, Allstate granted Ms. Swanson an unpaid Illness Leave of Absence ("Illness LOA"), which lasted two years, until August 1997, pursuant to the terms of Allstate's Illness LOA policy (Def.'s Facts ¶¶ 99, 106).

Under Allstate's Illness LOA policy, "[a]n employee who is on an unpaid illness leave of absence is guaranteed reinstatement, so long as such job continues to exist, to their same job, or one of like status and pay for up to 2 years" (Def.'s Facts ¶ 99). Allstate retains the right to obtain a Physician's fitness for duty certification before reinstating an employee after an Illness LOA (*Id.* ¶ 100).

### H. The Accommodation and Interactive Process.

When Ms. Swanson's Illness LOA was about to expire on August 30, 1997, she sought to return to her former position as an Assistant Counsel III (Def.'s Facts ¶¶ 115, 126, 128, 140). The Illness LOA policy further provides, "[i]f the employee cannot resume the same *job responsibilities,* every reasonable effort should be made to accommodate the employee's needs" (Def.'s Facts ¶ 101) (emphasis added). The Illness LOA policy provides that "[a]n employee's refusal to accept the former position or a reasonably comparable

---

7. Ms. Swanson disputes that her transfer rights were unaffected, but offers no evidence sufficient to create a genuine dispute in the face of the sworn statement by Allstate that while *performance*-based JIJs can restrict transfer rights, *behavior*-based JIJs do not (Def.'s Facts ¶ 96; Norton Aff., ¶¶ 15–18).

8. While on leave, Ms. Swanson filed her first charge of discrimination with the EEOC, in which she alleged gender discrimination and retaliation for her complaints about that alleged discrimination (Def.'s Facts ¶ 33). While still on leave, on October 24, 1997, Ms. Swanson filed her original complaint, which initially asserted those claims of discrimination (Def.'s Facts ¶ 6).

position will be considered an Employee initiated termination" (*Id.* ¶ 102).

Allstate offered to return Ms. Swanson to her former position full-time and with the same reporting relationships (Def.'s Facts ¶ 136; Am. Compl. & Answer ¶ 22). Ms. Swanson indicated that she would return to work on August 28, 1997, but only on the following conditions: that she work only three days per week, and that she have no reporting relationship to Mr. Sporleder or Ms. Hoffman—or to any department or staff under Mr. Sporleder or Ms. Hoffman (Def.'s Facts ¶ 135). With her letter, Ms. Swanson included a handwritten note from her psychiatrist, Dr. Judith Lichtenstein, which released her to work three days per week (*Id.;* Pl.'s Add'l Facts ¶ 190). Dr. Lichtenstein also stated that it was medically "recommended" that Ms. Swanson not report to Ms. Hoffman or Mr. Sporleder (or persons or departments under their supervision), and that in her medical opinion Ms. Swanson "would make the best adjustment to an entirely new position and work setting" (Def.'s Facts ¶ 190, Ex. J.(12)).

Although the parties quarrel about whether those restrictions were "medically necessary" (Def.'s Facts ¶ 127; Pl.'s Add'l Facts ¶ 191), the undisputed fact is that Dr. Lichtenstein's letter did not use the word "necessary." Moreover, Dr. Lichtenstein's deposition testimony clearly indicates that the part-time work restriction was merely a recommendation and was not, in fact, medically necessary (Def.'s Facts ¶ 126–127; Pl.'s Resp. ¶ 134). Dr. Lichtenstein believed that the transition back to work would be easier for her if she started part-time (Def.'s Facts ¶ 128); but she also believed that Ms. Swanson could return to work full-time as of August 1997 (*Id.* ¶ 130). And, Ms. Swanson admits that "[t]he requested recommendations were simply suggestions designed to make the

transition back to work easier for [her]" (Def.'s Facts ¶ 128). Ms. Swanson also admits that she could perform all of her job functions as an Assistant Counsel III for Allstate in August 1997, except, perhaps, her reporting relationships with her former supervisors (Def.'s Facts ¶¶ 129, 131–134). As for the reporting relationship restriction, Dr. Lichtenstein testified that this restriction was a "necessity" (Pl.'s Add'l. Facts, Ex. J, 2/19/99 Tr. 58). However, Dr. Lichtenstein offered no medical basis for this restriction: Dr. Lichtenstein said she recommended it as a matter of "caution," even though she was not concerned about a risk of relapse by Ms. Swanson, because she viewed it as "common practice" to separate persons who had been in conflict (*Id.,* at 58–60).

## I. Allstate's Requests for Independent Medical Examinations.

Allstate did not summarily deny Ms. Swanson's requested accommodations. Instead, Allstate requested Ms. Swanson to undergo an independent medical examination ("IME") with Dr. Henry Conroe on September 5, 1997 (Def.'s Facts ¶ 136).[9] Ms. Swanson complied with this request (Def.'s Facts ¶¶ 143, 145), and Allstate, accordingly, extended Ms. Swanson's leave of absence while this evaluation proceeded (Def.'s Facts ¶ 140).

Dr. Conroe's report provided a detailed description of what he observed to be Ms. Swanson's continued depression (Def.'s Facts ¶¶ 156–163). Dr. Conroe observed that Ms. Swanson "still becomes disoriented," and that she acknowledged "continuing episodes ... of mental 'fuzziness'" (*Id.,* ¶¶ 159–60); that she exhibited "continuing problems with concentration" (*Id.,* ¶ 161); and continued to experience sleep problems, headaches and diminished energy (*Id.*). Dr. Conroe opined that Ms. Swanson would be unable to perform nu-

---

9. The parties dispute whether this request for an IME constituted a request for a "Fitness for Duty Certification" under Allstate's policies (Def.'s Facts ¶ 136; Pl.'s Resp. ¶ 136).

This fact, however, is not material to the resolution of the issues raised by defendant's motion, so we do not address it here.

merous essential job functions of an attorney, such as reviewing complex inquiries; advocating, negotiating, representing and defending positions; and reporting to people in higher positions and sharing information (Pl.'s Add'l Facts ¶ 211).

Dr. Conroe also stated his belief that Ms. Swanson would be "overwhelmed with anxiety" if she returned to Allstate (Pl.'s Add'l Facts ¶ 213). Dr. Conroe opined that Ms. Swanson would "decompensate emotionally if she were to return to her position as an attorney at Allstate, even on a part-time basis with different reporting relationships," and that "she is not fit to return to work even with the accommodations proposed by her psychiatrist" (Def.'s Facts ¶ 163). Ms. Swanson does not dispute that Dr. Conroe made these observations and reached these conclusions (Pl.'s Resp. ¶ 163).

## J. The Interactive Process.

Thus, as of November 1997, Allstate was confronted with seriously conflicting medical opinions concerning Ms. Swanson: Dr. Lichtenstein had released her for part-time work with reporting restrictions, and Dr. Conroe opined she was not able to return to work at Allstate under any circumstances. To resolve that conflict, Allstate proposed that a third psychiatrist, chosen independently by Drs. Lichtenstein and Conroe, evaluate Ms. Swanson's condition (Def.'s Facts ¶ 164). Allstate further agreed to be bound by the conclusion reached by the psychiatrist selected by Drs. Lichtenstein and Conroe (Id.).

Ms. Swanson's attorney responded to this request by a letter stating that she refused to submit to a second IME, because that it would not "add any further insight to this matter" (Pl.'s Resp. ¶¶ 165). That letter also asked if Allstate was adopting Dr. Conroe's report (Id.). In response, Allstate's counsel wrote a letter dated December 4, 1997, stating that Allstate was not accepting or rejecting either Dr. Lichtenstein's or Dr. Conroe's opinions, but sought the additional IME as "the best way" to resolve those conflicting opinions and to determine if Ms. Swanson's "mental health has improved to a sufficient level to carry out her obligations as an attorney" for Allstate (Def.'s Facts, Ex. A. (50)). That letter also stated that "Allstate is not rejecting Ms. Swanson's request to return to work in any capacity, but simply [is] trying to evaluate whether or not she is fit to do so" (Id.). This occasioned a further exchange of letters between lawyers for the parties, with Ms. Swanson continuing to refuse to submit to a second IME. Ms. Swanson's counsel proposed an alternative: a trial period back at work under Dr. Lichtenstein's restrictions (Id., Ex. A. (52)), which Allstate rejected (Id., Ex. A.(54)). By a letter of January 12, 1998, Allstate set January 30, 1998 as the deadline for Ms. Swanson to agree to the second IME or be removed from the Illness LOA (Id., Ex. A. (55)).

That letter prompted a response written by Ms. Swanson personally, rather than by her attorney (Def.'s Facts, Ex. A. (56)). In a letter dated January 29, 1998—one day before the January 30 deadline—Ms. Swanson stated that a third IME "would deprive [her] of [her] legal rights and remedies" and that "[her] continued career with Allstate [was] simply too important to place in the hands of an unknown psychiatrist" (Def.'s Facts ¶ 173). Ms. Swanson stated that instead, she "chose to place [her] faith in the rights and processes guaranteed to [her] under the law" and reiterated that her "release [from Dr. Lichtenstein] was sufficient under Allstate's standards to certify her as fit to reoccupy her former position" and that "Allstate's refusal to reinstate her left her no choice but "to seek every legal means available to [her] to remedy the current situation" (Id.).

By a letter dated January 30, 1998, Allstate responded that it "regre[ted] Ms. Swanson's decision" since it "want[ed] to work with her in determining, what if any, work she could perform for Allstate given her current medical condition[,]" but was

left with "no choice but to continue to rely on Dr. Conroe's ... examination and evaluation of [Ms. Swanson's] condition" (Def.'s Facts, Ex. A.(57)). In that letter, Allstate informed Ms. Swanson that she would be removed from her extended leave of absence (*Id.*).

By letter dated February 24, 1998, Allstate terminated Ms. Swanson's employment (Def.'s Facts ¶ 175). On March 18, 1998 Ms. Swanson filed an EEOC charge alleging violation of the ADA (Def.'s Facts ¶ 176). Thereafter, on April 23, 1998, Ms. Swanson filed her amended complaint, adding the ADA claim to this case (Def.'s Facts ¶ 7).

### III.

### A. Ms. Swanson's Gender Discrimination Claim.

Allstate offers two grounds for summary judgment to be granted in its favor on the gender discrimination claim. *First,* Allstate asserts that virtually all of Ms. Swanson's gender discrimination claims are time-barred, and that Ms. Swanson cannot avail herself of the continuing violation theory to revive those claims. *Second,* Allstate contends that as to the only gender claim that is not time-barred (the failure to promote in 1995), Ms. Swanson cannot establish a *prima facie* case of discrimination, and even if she could do so, cannot show that Allstate's stated reason for not promoting her was a "lie." We address each of these arguments in turn.

### 1.

■ Under Title VII, a plaintiff has 300 days from the occurrence of an allegedly discriminatory act in which to file a timely charge either with the federal Equal Em-

ployment Opportunity Commission or the appropriate state agency. *Hardin v. S.C. Johnson,* 167 F.3d 340, 344 (7th Cir.1999). Generally, a Title VII plaintiff is only allowed to seek relief for conduct occurring within the limitations period. *Galloway v. General Motors Service Parts Oper.,* 78 F.3d 1164, 1166 (7th Cir.1996). Here, Allstate asserts, and Ms. Swanson agrees, that she filed her charge of gender discrimination with the EEOC on November 27, 1995 (Def.'s Facts ¶ 33). Thus, in the ordinary course, Ms. Swanson would be barred from pursuing her gender discrimination claim based on conduct occurring more than 300 days before that date: February 1, 1995.[10]

■ An exception to this rule is the "continuing violation theory," which allows a "plaintiff to get relief for a time-barred act by linking it with an act that is within the limitations period. For purposes of the limitation period, courts treat such a combination as one continuous act that ends within the limitations period." *Koelsch v. Beltone Electronics Corp.,* 46 F.3d 705, 707 (7th Cir.1995) (*quoting Selan v. Kiley,* 969 F.2d 560, 564 (7th Cir.1992)). The continuing violation doctrine applies "[w]hen it would be unreasonable to expect the plaintiff to perceive offensive conduct as [discriminatory] before the limitations period runs, or [when] the earlier discrimination may only be recognized as actionable in light of 'events that occurred later, within the period of the statute of limitations,'" or "when, after an initial incident of discrimination, a plaintiff does not feel 'sufficient distress to ... mak[e] a federal case.'" *Hardin,* 167 F.3d at 344 (*quoting Galloway,* 78 F.3d at 1166, 1167).

---

**10.** In her deposition, Ms. Swanson stated that she signed the charge on October 6, 1995, but the EEOC did not receive the Charge until November 27, 1995. However, Ms. Swanson also testified that she filed a charge at the "State of Illinois building, on October 6, 1996" (Def.'s Facts, Ex. A (Swanson Dep. at 974)). When filing that charge with the State of Illinois, Ms. Swanson checked a "co-filing" box stating that "I want this charge filed with both the EEOC and the state or local Agency, if any" (Compl., Ex. A). Thus, we believe the EEOC filing date is October 6, 1995, which would result in claims pre-dating December 10, 1994 being barred. But this point does not alter the Court's analysis with respect to the untimeliness of portions of Ms. Swanson's gender discrimination claim.

■ However, the Seventh Circuit has made clear that the continuing violation theory is a limited one. "[T]he purpose of permitting a plaintiff to maintain a cause of action on the continuing violation theory is to permit the inclusion of acts whose character as discriminatory acts was not apparent at the time they occurred." *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 446 (7th Cir.1994). Thus, if a plaintiff knew, or "with the exercise of reasonable diligence would have known after each act that it was discriminatory and had harmed" her, she must sue over that act within the relevant statute of limitations. *Jones v. Merchants Nat'l Bank & Trust Co. of Indianapolis*, 42 F.3d 1054, 1058 (7th Cir.1994) (*quoting Moskowitz v. Trustees of Purdue University*, 5 F.3d 279, 281–82 (7th Cir.1993)). Where a pattern of harassment spreads out over years, and it is evident long before the plaintiff sues that she was a victim of actionable harassment, she "cannot reach back and base her suit on conduct that occurred outside the statute of limitations period."' *Hardin*, 167 F.3d at 344 (*quoting Galloway*, 78 F.3d at 1167).

■ In this case, Ms. Swanson at first had no complaints about Mr. Brodnan. Even when she complained in May 1990 about the rating she received and the lack of a promotion, she did not appear to attribute Mr. Brodnan's conduct to gender discrimination: she complained that she was being treated far worse than less qualified men *and* women (Def.'s Facts ¶ 47). However, the undisputed facts show that Ms. Swanson believed that she was being subjected to gender discrimination at least as far back as October 1991, when she complained that Mr. Brodnan was discriminating against her (Def.'s Facts ¶ 9). Ms. Swanson now tries to split hairs by denying that her complaint "was necessarily based upon gender at that time" (Pl.'s Resp. to Def.'s Facts ¶ 9), but the deposition testimony Ms. Swanson cites undermines her assertion. Ms. Swanson testified that when she com-

plained about alleged discrimination in October 1991, "in the back of my mind something was telling me that [Mr. Brodnan] just thought that a man was better for the position than a woman." (Def.'s Facts, Ex. A. (Swanson Dep. 321)).

If the 1991 complaint were not enough to demonstrate that in Ms. Swanson's mind it was "evident long before" her 1995 EEOC charge that she was a victim of gender discrimination, *Hardin*, 167 F.3d at 344, that point is conclusively established by Ms. Swanson's December 10, 1993 memorandum entitled "REQUEST FOR TRANSFER DUE TO LONGSTANDING DISCRIMINATION." In that three-page, single-spaced document, Ms. Swanson explained the basis for her view that she was the victim of gender discrimination by Mr. Brodnan:

a. Ms. Swanson stated "[a]pproximately five years passed before I received a promotion from Mr. Brodnan. However, other male attorneys, less tenured and experienced than I, received a promotion from him within three to three and one-half years."

b. Ms. Swanson claimed that Mr. Brodnan asked her to not express her "legitimate legal opinion in an overly rigid manner" while at the same time not providing another male attorney, Paul Ryske, with any negative feedback for his aggressiveness. Ms. Swanson charged that "as a man, Mr. Ryske has not been held back because of his assertiveness."

c. Ms. Swanson further claimed that "Mr. Brodnan's failure to rate me "exceeds" on at least one of the reviews following that award demonstrates his discriminatory treatment of me."

d. Ms. Swanson concludes by stating, "[I]n effect, I will continue to be discriminated against because of Mr. Brodnan['s] assessment that I am too assertive irrespective of the fact

that I technically report to Ms. Hoffman."

(Def.'s Facts, Ex. A. Tab 24 at pp. SWAN 00643–SWAN 00645).

Those undisputed facts show that Ms. Swanson had the belief that Mr. Brodnan was discriminating against her on the basis of gender by no later than December 1993, long before the 300–day limitations period dating back from her October 6, 1995 EEOC charge. Nor can Ms. Swanson claim the earlier discrimination she perceived did not cause her "sufficient distress to . . . mak[e] a federal case." *Hardin,* 167 F.3d at 344. The alleged discrimination was sufficient to provoke an internal complaint in 1991 and a request for a transfer in December 1993; and in the 1993 complaint, Ms. Swanson stated her opinion that Mr. Brodnan's alleged discrimination would continue.

In these circumstances, the continuing violation is inapplicable. *See Jones,* 42 F.3d at 1058 (stating that where plaintiff admitted that her failure to receive a promotion in 1989 was discriminatory, plaintiff could not rely on continuing violation theory in a discrimination suit). The Court finds that of all Ms. Swanson's claims for conduct predating February 1, 1995 are time-barred. That leaves only one alleged act of discrimination within the 300 day period—the failure to promote Ms. Swanson from Assistant Counsel III to Associate Counsel in 1995. We now turn to that claim.[11]

**2.**

In assessing Allstate's summary judgment motion, the Court must "view the evidence presented through the prism of the substantive evidentiary burden." *Liberty Lobby,* 477 U.S. at 254, 106 S.Ct. 2505. Plaintiff here does not seek to defeat summary judgment by offering "direct" evidence that Allstate had a discriminatory motive in not promoting Ms. Swanson but instead relies on her ability to establish the four elements of a *prima facie* case of gender discrimination under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (Def.'s Mem. 6; Pl.'s Mem. 9).

Under the *McDonnell Douglas* test, "[i]n a failure to promote case, the plaintiff must show that (1) she is a member of a protected class; (2) she applied for and was qualified for the position sought; (3) she was rejected for the position; (4) those that were promoted had similar or lesser qualifications for the job, in other words, they were not more qualified than she." *Brill v. Lante Corp.,* 119 F.3d 1266 (7th Cir.1997) *citing Sample v. Aldi Inc.,* 61 F.3d 544, 548 (7th Cir.1995). If the plaintiff establishes a prima facie case under *McDonnell Douglas,* the employer must produce evidence of a legitimate, nondiscriminatory reason for the adverse action. *Wolf v. Buss (America), Inc.,* 77 F.3d 914, 919 (7th Cir.1996); *Brill,* 119 F.3d at 1270. If the employer meets this burden, the plaintiff must "offer evidence showing the employer's stated reasons are pretextual". Pretext may be shown by evidence that the proffered reasons are factually baseless; that they were not the actual motivation for the adverse personnel action; or that they were an insufficient basis to motivate the adverse action. *Wolf,* 77 F.3d at 919. Furthermore, the plaintiff's task on summary judgment is to produce sufficient evidence to sustain a reasonable inference that the employer's asserted reason is not the real reason for the adverse decision but is instead a cover-up for unlawful discrimination. *Mohan v. American Telephone and Telegraph Co.,* No. 97 C 7067, 1999 WL 495113, at *14 (N.D.Ill., June 30, 1999). "It is important to keep in mind, however, that there is a fine line between evidence that appropriately challenges the

---

11. Because Ms. Swanson's claims of discrimination predating February 1, 1995 are time-barred, the Court need not address the numerous factual disputes between the parties as to what occurred during that time period and why. Those disputes are not material to the outcome of this motion.

employer's proffered reasons as being unworthy of credence and evidence that merely shows that the employer made a mistake or a had business judgment." *Kralman v. Illinois Dept. of Veterans' Affairs,* 23 F.3d 150, 156 (7th Cir.1994).

On summary judgment, Allstate does not contest that Ms. Swanson has met the first three prongs of the *McDonnell Douglas* test: Ms. Swanson is a member of a protected class; she was qualified to serve as an Associate Counsel at Allstate; and she was rejected for that position (Def.'s Mem. 6–7, Def.'s Reply 5). Rather, Allstate argues that Ms. Swanson has failed to create a triable issue on whether the other employee promoted was more qualified than she, and that Ms. Swanson has failed to show that Allstate's stated reason for not promoting her was pretextual.

Ms. Swanson concedes that Mr. Milazzo, who delivered her evaluation in March 1995, harbored no discriminatory animus toward her (Def.'s Facts ¶ 15, 86). Likewise, Ms. Swanson does not accuse Mr. Sporleder, who decided not to promote Ms. Swanson in 1995, of gender-based discrimination (Def.'s Facts ¶ 16). The fact that these decision makers admittedly harbored no discriminatory motive toward Ms. Swanson generally would be enough to defeat her claim, no matter what Mr. Brodnan's motivations may have been in his dealings with Ms. Swanson: the animus of non-decision makers is generally irrelevant. *Hardin,* 167 F.3d, at 346 (*citing Eiland v. Trinity Hospital,* 150 F.3d 747, 750 (7th Cir.1998) (non-decision maker's discriminatory animus not imputed to company without showing sufficient nexus between this animus and decision-maker's employment decision)). Moreover, the mere fact that Ms. Swanson disagreed with Messrs. Milazzo's and Sporleder's decisions is of no moment: "Courts refuse to sit in judgment as super-personnel departments overseeing personnel decisions even if some judges think the decision to be mistaken or perplexing or silly." *Brill,* 119 F.3d at 1271. Allstate had the right to

make a wrong decision, so long as it was not a decision motivated by discrimination.

■ Ms. Swanson seeks to supply that discriminatory motive by imputing Mr. Brodnan's alleged animus to the evaluation by Mr. Milazzo and the failure to promote by Mr. Sporleder. The Seventh Circuit has recognized that the prejudices of an employee may be imputed to the decision maker where the employee, "by concealing relevant information from the decision making employee or feeding false information to him, is able to influence the decision." *Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394, 1400 (7th Cir.1997). Seeking to avail herself of *Wallace,* Ms. Swanson's theory is that Mr. Brodnan was the puppet-master who pulled all the strings, and thus controlled—either directly or indirectly—the decisions by Messrs. Milazzo and Sporleder. However, the evidentiary reeds offered by Ms. Swanson on summary judgment are too slender to support a triable issue on this theory.

### a.

Ms. Swanson asserts that Mr. Milazzo was not the one who actually evaluated her performance in 1994, and that even though the evaluation was signed and delivered by Mr. Milazzo, it was in fact done *sub silentio* by Mr. Brodnan. Mr. Milazzo and Mr. Brodnan have provided sworn statements denying that this was so, which Ms. Swanson has no direct evidence to rebut. The closest Ms. Swanson comes is her contention that Mr. Milazzo told her in mid–1994 that he could not rate her performance, and that a rating would be left up to Mr. Brodnan. However, even assuming Mr. Milazzo made this statement about his intentions as of mid–1994 (*see* Pl.'s Add'l Facts ¶¶ 124–25 and Def.'s Resp.), it cannot support a triable issue as to what he actually did in preparing the March 1995 evaluation.

*First,* and foremost, the evaluation itself reflects Mr. Milazzo's observations about Ms. Swanson's performance in ReAd during 1994. There is no evidence that Mr.

Brodnan, who worked in a different department, knew about the matters on which Mr. Milazzo commented. Moreover, Ms. Swanson admits that Mr. Brodnan had no control over the ReAd Department, and that there was no direct reporting relationship between Mr. Brodnan and Mr. Milazzo (Def.'s Facts ¶ 85).

*Second*, it is undisputed that when Mr. Milazzo made the alleged statement to Ms. Swanson in mid–1994, he was unaware of Mr. Brodnan's upcoming departure from Allstate, and thus was unaware Mr. Brodnan would be gone when it was time to prepare the March 1995 evaluation. Ms. Swanson has offered no evidence that Messrs. Milazzo and Brodnan in fact discussed Ms. Swanson's March 1995 evaluation—either before or after Mr. Brodnan's departure. While Ms. Swanson may believe that is what happened, she has failed to offer evidence that would reasonably allow a jury to so conclude. In light of these undisputed facts, Mr. Milazzo's prediction in mid–1994 about how the evaluation would be done does not create a triable issue that Mr. Brodnan was involved in, or influenced, the evaluation that actually was delivered in March 1995.

### b.

Ms. Swanson also argues that Mr. Brodnan influenced the decision by Mr. Sporleder not to promote her. Ms. Swanson points to no evidence to contradict the sworn statements by Mr. Brodnan and Mr. Sporleder that they did not communicate with each other about the promotion decision. But Ms. Swanson asserts Mr. Brodnan nonetheless influenced the promotion decision in one or more of the following ways: (a) she claims Mr. Sporleder allegedly relied on a 1993 performance evaluation by Ms. Hoffman, which Ms. Swanson claims was in fact the handiwork of Mr. Brodnan; and (b) Ms. Swanson claims that Mr. Sporleder was influenced by Mr. Brodnan's statement in a written "executive continuity plan" that Ms. Swanson would not be promoted (Pl.'s Mem. 6, 9–10). The Court finds that there are insufficient facts to submit either theory to a jury.

As to the 1993 performance evaluation, Ms. Swanson has failed to offer evidence sufficient to allow a jury to reasonably conclude that Mr. Brodnan "poisoned the well," so that any discriminatory animus he alleged held was transferred to Ms. Hoffman. It is undisputed that Ms. Hoffman was aware of a "history of problems" between Ms. Swanson and Mr. Brodnan (Pl.'s Add'l Facts, ¶ 94), both from conversations over the years with Mr. Brodnan and with others—including Ms. Swanson (Pl.'s Add'l Facts, Ex. H., at 11–13). The Court believes that in *Wallace,* the Seventh Circuit intended the situation where the prejudices of a non-decision maker can be imputed to a decision maker to be limited to cases where there is proof that the non-decision maker conveyed or withheld specific information. However, we do not believe that *Wallace* supports the proposition that a triable issue is created merely because the decision maker (here, Ms. Hoffman) is aware of complaints by a non-decision maker (here, Mr. Brodnan).

In this case, Ms. Swanson is unable to muster any evidence that Ms. Hoffman's criticisms were the result of false information conveyed or favorable information concealed by Mr. Brodnan. Ms. Hoffman's evaluation did not merely parrot early comments by Mr. Brodnan. Ms. Hoffman's criticisms of Ms. Swanson's relationships and dealings with co-workers cited instances that occurred "[i]n the last four months since I have been supervising [Ms. Swanson]" (Def.'s Facts ¶ 63)—instances that Ms. Hoffman thus would know about from personal knowledge. And, Ms. Hoffman criticized Ms. Swanson on an aspect of performance not previously criticized by Mr. Brodnan—her "strict construction" of laws (*Id.* ¶ 62). Ms. Swanson is entitled to disagree with Ms. Hoffman's criticisms, but her mere disagreement is not enough to create a trial issue.

Ms. Swanson's argument that Mr. Sporleder's promotion decision was influenced

by the 1993 and 1994 executive continuity evaluations prepared by Mr. Brodnan fares no better. At the threshold, this argument fails because Ms. Swanson has offered no evidence to counter Mr. Sporleder's sworn testimony that he was unaware of the information in these evaluations, which is further supported by the fact that Mr. Sporleder was not on the distribution list for those evaluations (Pl.'s Add'l Facts, Ex. A. 20–21). Nor has Ms. Swanson offered facts to support Mr. Sporleder's sworn statement that he did not use the evaluations in making his promotion decisions in 1995 (Def.'s Reply Mem., Ex. D., ¶ 3). Moreover, the pattern of promotions in 1995 is consistent with Mr. Sporleder's testimony, as that pattern did not reflect strict adherence to Mr. Brodnan's assessments. While Mr. Sporleder promoted Paul Ryske (whom Mr. Brodnan had slated for promotion in 1995), he did not promote either Ms. Swanson (for whom no targeted promotion date was listed) or a male attorney, John Noone (who had been targeted by Mr. Brodnan for promotion in 1995).[12]

Mr. Sporleder's unrebutted sworn testimony is that while he did not expect to promote Ms. Swanson, based on what he knew of her prior performance in the Business group, he awaited Mr. Milazzo's evaluation of her performance in ReAd in 1994 before making a final decision (Def.'s Facts, Ex. F., ¶ 7); that while awaiting that evaluation, he had personal dealings with Ms. Swanson in which she displayed conduct that he "perceived to be inappropriate and unprofessional" (Id. ¶ 9); and that he made his final decision when he saw Mr. Milazzo's evaluation (Id. ¶ 8). This evidence reveals a basis for Mr. Spor-

leder's decision independent from any bias by Mr. Brodnan. In the absence of evidence by Ms. Swanson of specific information Mr. Brodnan provided or concealed to affect Mr. Sporleder's decision, there is no triable issue on this point.[13]

### c.

Because Ms. Swanson lacks evidence sufficient to lead a jury reasonably to impute Mr. Brodnan's alleged bias to the decision makers, Ms. Swanson's gender discrimination claim falls due to her inability to offer evidence to rebut Allstate's legitimate, non-discriminatory reasons for the decision not to promote her. Allstate claims that there were budgeting constraints that allowed Mr. Sporleder to promote only two attorneys in his department, and that Ms. Swanson was not as deserving of a promotion as the two lawyers who were promoted: Ms. Hoffman and Mr. Ryske. As to the first point, Ms. Swanson has offered no evidence to contradict Mr. Sporleder's testimony that for fiscal reasons he could promote only two attorneys (Def.'s Facts, Ex. F., ¶¶ 4–5).

As to the second point, Ms. Swanson likewise has failed to offer evidence sufficient to create a triable issue as to whether Mr. Sporleder's statement that he found Ms. Hoffman and Mr. Ryske more qualified than Ms. Swanson is pretextual. Mr. Sporleder stated that, based on his personal observations of Mr. Ryske and on Ms. Hoffman's evaluation of him (which was more favorable than Mr. Milazzo's evaluation of Ms. Swanson), Mr. Sporleder concluded that Mr. Ryske deserved a promotion (Def.'s Facts, Ex. F., ¶ 6). Mr. Sporleder also concluded that Ms. Hoffman deserved a promotion, based on the

---

12. We note that it is undisputed that Mr. Brodnan's evaluations targeted other women for promotion in 1994 and 1995: Robyn Jennings and Nancy Hoffman (Def.'s Facts, Ex. B. 20–21). Thus, there is nothing on the face of Mr. Brodnan's targeted promotions that supports a claim of gender bias.

13. Nor do we believe a triable issue is created by the fact that Ms. Swanson was told in the

latter half of 1994 that on their return to the legal group Mr. Brodnan would decide if she received a promotion (Pl.'s Add'l Facts ¶ 131 and Def.'s Resp.). It is also undisputed that at the time of those statements, Mr. Brodnan was still the head of the legal group, and the persons making the statements did not know Mr. Brodnan was retiring (Id.).

quality of her performance and her discharge of additional responsibilities as a result of Mr. Brodnan's retirement (*Id.,* ¶ 5). Ms. Swanson admits that Mr. Sporleder harbored no gender-bias in his decisions (Def.'s Facts, ¶ 16). And, this admission finds further support in the fact that while Ms. Swanson was never promoted, Mr. Sporleder promoted both a male and female attorney, and declined to promote another male attorney. That promotion pattern does not support a finding of discrimination.

There is no evidence here that Mr. Sporleder chose to promote Ms. Hoffman and Mr. Ryske for any reason other than his honest belief that they were the most deserving candidates for the two promotions he could give. That is significant, because even if Mr. Sporleder's assessment was wrong, that is not enough to establish pretext. *Brill,* 119 F.3d at 1270. And, the fact that aside from Mr. Brodnan two of Ms. Swanson's other supervisors who dealt personally with Ms. Swanson—men and women alike—shared Mr. Sporleder's views further undermines Ms. Swanson's claim. *See Maarouf v. Walker Mfr. Co.,* 210 F.3d 750, 754–55 (7th Cir.2000). On the factual record before the Court, Allstate's summary judgment motion as to Ms. Swanson's gender discrimination claim must be granted.

## B. Ms. Swanson's Retaliation Claim.

In Count II of her amended complaint, Ms. Swanson claims that Allstate retaliated against her for her complaints of gender discrimination, in violation of 42 U.S.C. § 2000e–3(a). In order to establish a claim of retaliation, a plaintiff must either offer direct evidence of discrimination, or proceed under the burden-shifting method set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas,* the plaintiff must first establish a prima facie case by a preponderance of evidence. A *prima facie* case is established when a plaintiff shows that: "1) she

is engaged in a protected activity under Title VII; 2) she suffered an adverse employment action subsequent to her participation; and 3) there exists a causal connection between the adverse employment action and her participation in protected activity." *Koelsch v. Beltone Electronics Corp.,* 46 F.3d 705, 708 (7th Cir.1995).

If a *prima facie* case of retaliation is established, then the burden shifts to the employer to provide a nonretaliatory explanation for its actions. If the employer satisfies that burden of production, "the burden shifts back to the employee to demonstrate that the employer's stated reason is merely a pretext for covering up discriminatory conduct." *Smart,* 89 F.3d at 439. At the end of the day, the plaintiff must offer evidence sufficient to show that "the employer would not have taken adverse action 'but for' the protected expression." *Cullom,* 209 F.3d at 1040. However, the Supreme Court has recently reaffirmed that under the *McDonnell Douglas* test, proof establishing a prima facie case along with evidence sufficient to cause "rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.,* — U.S. —, 120 S.Ct. 2097, 2108, — L.Ed.2d — (2000), *quoting St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

■ Ms. Swanson's central argument is that Allstate retaliated against her for her complaints about the March 1995 evaluation delivered by Mr. Milazzo by placing her on the JIJ on April 11, 1995. The Court finds that Ms. Swanson has offered facts sufficient to get to trial on this claim.

### 1.

■ Plaintiff has offered facts which, if accepted by a jury, could establish a prima facie case. *First,* there are facts from which a jury could decide that plaintiff was engaged in statutorily pro-

tected activity. In her response to her 1994 PDS review on March 30, 1995, Ms. Swanson complained about her lack of promotion, the promotion of Mr. Ryske, and alleged continuous acts of gender discrimination by Mr. Brodnan. Ms. Swanson is correct in asserting that these comments are the kind of expression for which Title VII is designed to protect from retaliation. *See Hunt–Golliday v. Metropolitan Water Reclamation District of Greater Chicago,* 104 F.3d 1004, 1008 (7th Cir.1997) (finding that filing of complaint with internal equal employment opportunity officer is a statutorily protected activity); *Filipovic v. K & R Express Systems Inc.,* 176 F.3d 390, 398 (7th Cir.1999) (holding that filing charges with the EEOC is a statutorily protected activity); *Melton v. Five Four Corp.,* No. 99 C 1274, 2000 WL 97568, at *11 (N.D.Ill. Jan. 25, 2000) (holding that complaining to manager about discrimination at work place constitutes statutorily protected activity). The fact that the Court has granted Allstate summary judgment on Ms. Swanson's gender discrimination claim does not foreclose her claim of retaliation. An employee may engage in statutorily protected expression under Title VII § 2000e–3(a) even if the challenged practice does not violate Title VII. *Dey v. Colt Construction & Development Co.,* 28 F.3d 1446, 1457 (7th Cir.1994); *Collins v. State of Illinois,* 830 F.2d 692, 702 (7th Cir. 1987).[14]

*Second,* Ms. Swanson has offered facts sufficient to create a triable issue on the link between her reaction to the March 1995 evaluation and being placed on JIJ status. Generally, a plaintiff may establish a prima facie case of such a link through evidence that the discharge took place on the heels of protected activity, *Johnson v. Sullivan,* 945 F.2d 976, 980 (7th Cir.1991), because suspicious timing constitutes circumstantial, or indirect, evidence to support a claim of discrimination. *Hunt–Golliday,* 104 F.3d at 1013 (*citing Troupe v. May Dept. Stores Co.,* 20 F.3d 734, 736 (7th Cir.1994)). Thus, a short time span between two events can be enough for plaintiff to create a triable issue as to the required causal link. *See Sweeney,* 149 F.3d at 557 (noting that an adverse action occurring one day or one week after the protected speech would establish the required nexus); *Johnson v. City of Fort Wayne, Ind.,* 91 F.3d 922, 938 (7th Cir.1996) (stating that a reasonable inference on the causation issue arises when the adverse job action came two weeks after the filing of the EEOC complaint).

 *Third,* Ms. Swanson has offered facts sufficient to allow a jury to conclude that the JIJ constituted an "adverse employment action." In so ruling, the Court is mindful of the Seventh Circuit's admonition that "not everything that makes an employee unhappy is an actionable adverse action." *Cullom,* 209 F.3d at 1041 (quoting *Smart,* 89 F.3d at 441). Rather, the complained of action must materially affect the employment conditions, *Johnson v. City of Fort Wayne, Ind.,* 91 F.3d 922, 932 (7th Cir.1996), which requires "more than 'a mere inconvenience or an alteration of job responsibilities.'" *Cullom,* 209 F.3d at 1041 (*quoting Ribando v. United Airlines, Inc.,* 200 F.3d 507,

---

**14.** We cannot agree with Allstate's claim that because Ms. Swanson's complaints were "chronic" (and by that, we assume Allstate means numerous and repeated), they cannot constitute statutorily protected activity as a matter of law (Def.'s Mem. 8–10). In support of this argument, plaintiff cites to *Talanda v. KFC Nat'l Mgmt. Co.,* 140 F.3d 1090, 1096 (7th Cir.1998), *McDonnell v. Cisneros,* 84 F.3d 256, 259 (7th Cir.1996), and *Rollins v. State of Florida Dept. of Law Enforcement,* 868 F.2d 397, 401 (11th Cir.1989). However, none of these cases hold that the mere volume of complaints, without more, establishes that the employees' complaints are frivolous, or that the employee did not reasonably believe he or she was opposing discriminatory activity. The Court's rejection of Allstate's argument that Ms. Swanson's complaints are not protected activity as a matter of law will not bar Allstate from attempting to prove, on the facts, that Ms. Swanson's complaints were not protected.

510 (7th Cir.1999)). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993). By contrast, adverse performance ratings alone are not enough to constitute adverse employment actions. *Smart*, 89 F.3d at 442.

■ Despite these limitations, what constitutes an "[a]dverse employment action has been defined quite broadly in this circuit." *Smart*, 89 F.3d at 441. An adverse employment action "is not limited solely to loss or reduction of pay or monetary benefits. It can encompass other forms of adversity as well." *Smart*, 89 F.3d at 441. "The question whether a change in an employee's job or working conditions is materially adverse, rather than essentially neutral, is one of fact, ..., and so can be resolved on summary judgment only if the question is not fairly contestable." *Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 273–74 (7th Cir. 1996).

As Allstate correctly points out, the JIJ did not have any immediate quantifiable effect on Ms. Swanson's employment: she was not suspended or demoted, her job title and responsibilities remained unchanged, and she suffered no decrease in pay. Ms. Swanson contends that the JIJ had the detrimental effect of preventing her from transferring to another department (Pl.'s Mem. 14), but offers no evidence sufficient to create a triable fact issue in the face of Allstate's sworn testimony that a JIJ administered due to "behavioral" issues such as those attributed to Ms. Swanson does not prevent an employee from transferring (Def.'s Facts ¶ 96, and Ex. H. (Norton Aff. at ¶¶ 15–18)).[15] Here, it is clear from the face of the document that the JIJ issued to Ms. Swanson was behavior-based, not performance-based.

■ Nor can Ms. Swanson claim an adverse employment action because she received fewer stock options than she would have been awarded had she not been on the JIJ (Pl.'s Mem. 14). Mr. Sporleder's deposition testimony, which Ms. Swanson relies upon to establish the above undisputed fact, also states that the purpose of the stock options is to provide an incentive to people and reward the "best performers," and is thus discretionary (Pl.'s. Add'l Facts, Ex. I, 269). The loss of a discretionary bonus is not the equivalent of a reduction in a fixed salary, and thus has been held not to constitute an adverse employment action. *See Rabinovitz v. Pena*, 89 F.3d 482, 488–89 (7th Cir.1996) (in affirming grant of summary judgment for defendant, held that "loss of a bonus is not an adverse employment action in a case such as this where the employee is not automatically entitled to the bonus"). Likewise, the loss of discretionary stock options that Ms. Swanson was not "automatically entitled to" receive does not constitute an adverse employment action.[16]

---

**15.** In denying Allstate's assertion that her ability transfer was unaffected, Ms. Swanson cites testimony and an exhibit from Mr. Sporleder's deposition that has nothing to do with transfer rights. Ms. Swanson also cites her own testimony, in which she claims Mr. Brodnan told her that "in the past people who had experienced trouble, any kind of trouble were not candidates for transfer" (Pl.'s Resp. to Def.'s Facts ¶ 97). However, Ms. Swanson offers no time frame for this statement, and does not indicate that Mr. Brodnan was talking about the effect of a JIJ when he made the statement. What's more, the statement attributed to Mr. Brodnan is not consistent with the undisputed fact that Ms. Swanson had "experienced trouble" as of January 1994, but nonetheless received a transfer at her request. For those reasons, the statement attributed to Mr. Brodnan does not create a material fact dispute.

**16.** Ms. Swanson also claims an adverse employment action because the administration of the JIJ proximately caused Ms. Swanson's major depression; the depression in turn

The absence of those kinds of quantifiable employment detriments, however, is not necessarily fatal to a retaliation claim, as "adverse employment actions extend beyond readily quantifiable losses." *Smart,* 89 F.3d at 441. On several occasions, the Seventh Circuit has commented that being placed on a probationary or remedial status could constitute an adverse employment action sufficient to support a retaliation claim. *See Cullom,* 209 F.3d at 1041–42 ("[W]e have suggested that being placed on probation could also be an adverse action"); *Smart,* 89 F.3d at 442 (commenting that while negative evaluations are not enough to alone to constitute adverse action, if plaintiff "had been, as she alleges, put on probation, we might have a different case before us"); *see also Adusumilli v. City of Chicago,* 164 F.3d 353, 362–63 (7th Cir.1998) (noting unappealed determination by the district court that "placing [plaintiff] in the Behavior Alert program and subsequently firing her were adverse actions"). In this case, a jury could reasonably determine that being placed on JIJ status constituted an adverse employment action.

Unlike a mere negative evaluation or a vague warning of future discipline, the JIJ plainly put Ms. Swanson at risk of immediate termination for *any* failure to comply with the directives concerning her behavior. A jury could reasonably decide that the adverse effect of this risk created by the JIJ was heightened by two factors: (1) the subjective and general nature of the directives (such as, requiring that Ms. Swanson "at all times remain professional, courteous and respectful of others," and that "[u]njustified or unexcused outbursts, 'flare ups,' comments or other remarks displaying lack of professionalism, courtesy or respect will not be accepted") (Def.'s Facts, Ex. 98), and (2) Allstate's decision that the JIJ "will remain in effect indefinitely" (*id.*), which meant that Ms. Swanson would remain at risk of immediate termination indefinitely.[17]

The evidence here reveals more than a case of the JIJ causing a "bruised ego" or even "humiliation," which is the type of effect that the Seventh Circuit has held will not support a retaliation claim. *Smart,* 89 F.3d at 441. A jury could reasonably find that the JIJ significantly altered Ms. Swanson's employment status, *see Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (a "tangible employment action constitutes a significant change in employment status")—and certainly not for the better. A jury could reasonably find the

---

caused her to take an extended leave of absence; and the leave ultimately resulted in her termination nearly three years later when she and Allstate could not agree on a mechanism to determine her ability to return to work (Pl.'s Mem. 13). The threshold problem with this argument is its initial premise: that even if the JIJ itself does not adversely affect Ms. Swanson's terms of employment, her subjective reaction to the JIJ can satisfy the "adverse employment effect" prong of a retaliation claim. However, the Court believes that the *personal* effect on Ms. Swanson of the JIJ does not constitute an adverse *employment* action that will support a Title VII retaliation claim. A retaliation claim requires that the employer take action that adversely effects the plaintiff's job conditions. To accept Ms. Swanson's argument would allow retaliation claims to turn not on the objective effect of a particular action on a person's conditions of employment, but on the subjective impact of that action on a person's psyche. That would

result in retaliation claims becoming untethered from their purpose under Title VII of prohibiting job discrimination against an employee who complains of discrimination, but denying *claims where the employer's action has "little or no effect on the employee's job." Sweeney v. West,* 149 F.3d at 550, 556 (7th Cir.1998).

17. *Sweeney v. West,* 149 F.3d 550, 556 (7th Cir.1998), is not to the contrary. There, plaintiff received counseling statements and was not disciplined, but was warned that failure to refrain from behavior that affected the morale and work atmosphere of the organization would result in disciplinary action. *Id.* at 556. Following the reasoning of *Smart,* the Seventh Circuit held that the counseling statements were not actionable. However, there was no probationary status imposed on the plaintiff there, and certainly no imminent risk of termination.

JIJ was intended to be the "last stop" before an inevitable dismissal. *See Cullom,* 209 F.3d at 1038. Under the foregoing authorities, we believe that whether the JIJ was an adverse employment action is, at the very least, a "fairly contestable" point that cannot be resolved on summary judgment.

### 2.

Because the facts submitted on summary judgment show that there is a triable issue as to each of the elements plaintiff must prove to establish a prima facie case, we turn to the question of whether Allstate has offered evidence of a legitimate, non-discriminatory reason for issuing the JIJ. If so, Ms. Swanson must point to evidence which, if accepted by the jury, could rebut that reason and (together with the prima facie case) establish that the JIJ was issued as retaliation.

Allstate has offered evidence that the motivation for the JIJ was not Ms. Swanson's complaints about her evaluation from Mr. Milazzo or lack of promotion, but instead was her episode with Ms. Hoffman on April 5, 1995. The evidence is sufficient to create a triable issue on that point. The event as related by Ms. Hoffman could reasonably be construed by the jury as insubordinate conduct by Ms. Swanson that, in the circumstances, warranted the JIJ. Moreover, the April 5 event occurred after Ms. Swanson's complaints about her evaluation, thus giving color to the view that the JIJ was triggered not by the complaints about Mr. Milazzo's evaluation but rather by the intervening dispute with Ms. Hoffman.

However, Ms. Swanson has submitted evidence which, if accepted by the jury, could reasonably lead to the conclusion that the JIJ was part of an effort to create a record to support a termination of Ms. Swanson in retaliation for her complaints about Milazzo's evaluation and lack of pro-

motion. It is undisputed that between the time of the Milazzo evaluation and the issuance of the JIJ, Ms. Hoffman urged that Ms. Swanson be offered a severance package (and fired if she didn't accept it) (Pl.'s Add'l Facts ¶ 157); and that when her proposal was rebuffed (*Id.* ¶ 158), she sought to discuss it with Allstate's general counsel (*Id.* ¶ 159). Moreover, Ms. Hoffman prepared notes for a conversation with Mr. McKay indicating that Ms. Swanson could have to be "set up" for a JIJ (Pl.'s Add'l Facts ¶ 182).

In *Mead v. United States Fidelity and Guaranty Co.,* 442 F.Supp. 114, 130 (D.Minn.1977), the district court found for the plaintiff on a retaliation claim where the defendant had prepared a memorandum indicating that "[i]f we wish to 'fire' either or both [plaintiffs] we must document the moves of the two of them over a period of time." *See also Smart,* 89 F.3d at 442 (characterizing *Mead* as involving a memorandum "which in essence said, 'Let's paper her file so we can get rid of her'"). Moreover, if the jury were to conclude that the dispute that Ms. Hoffman says gave rise to the JIJ was "trumped up," that, too, could lead the jury to conclude that the real reason for the JIJ was to retaliate for Ms. Swanson's complaints. *See Boyd v. Brookstone Corp. of New Hampshire, Inc.,* 857 F.Supp. 1568, 1571 (S.D.Fla.1994) ("An allegation that false performance evaluations were prepared in retaliation for the filing of an EEOC claim is a recognized cause of action").

██ The Court expresses no view as to how the jury in fact will resolve these numerous fact questions. For now, all that is important is that there are sufficient facts to allow a jury to reasonably find for either party on the retaliation claim. In these circumstances, summary judgment cannot issue for Allstate.[18]

---

18. Ms. Swanson, in passing, raises two additional theories of retaliation which may be rejected with little discussion.

*First,* Ms. Swanson asserts that her transfer to ReAd in January 1994, was in retaliation for her December 1993 memorandum complaining of gender discrimination (Pl.'s Mem.

## IV.

█ We now turn to Ms. Swanson's claim that Allstate failed to reasonably accommodate an alleged disability (clinical depression) by acceding to her request to work part-time and to report only to certain supervisors. In order to establish an ADA claim, a plaintiff must prove that she suffers from a "disability," and that notwithstanding the disability, she can perform the essential functions of the job— either without any adjustments or with "reasonable accommodation." *See Best v. Shell Oil Co.*, 107 F.3d 544, 547–48 (7th Cir.1997); *Weiler v. Household Fin. Corp.*,

101 F.3d 519, 524 (7th Cir.1996); *DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 797 (7th Cir.1995).

█ Allstate claims there is no factual dispute as to any of these elements; Ms. Swanson claims there is a triable fact issue as to each one. We agree with Allstate that the undisputed material facts establish that even assuming that Ms. Swanson was "disabled" within the meaning of the ADA, there was no failure to reasonably accommodate any such disability. On that ground, Allstate is entitled to summary judgment on Ms. Swanson's ADA claim.[19]

Mem. 13). However, Ms. Swanson admits she viewed this assignment a being retaliatory at the time (Pl.'s Add'l Facts, ¶ 120–21), and yet did not file a charge of discrimination within 300 days. Thus, this assertion is time-barred and for the reasons set forth above (*see* 969–70, *supra*), cannot be resurrected under continuing violation theory. In any event, this assertion ignores that Ms. Swanson's transfer to ReAd was the result of her own request for a transfer. While she had not specifically requested a transfer to ReAd, she did not indicate at the time that such a transfer was unacceptable. Nor does Ms. Swanson offer any evidence to show that the transfer resulted in diminished pay, benefits, job responsibilities, or in other detriments—to the contrary, she admits she liked, trusted and respected her supervisor in ReAd, and does not accuse him of discrimination (Def.'s Facts ¶ 74). In these circumstances, the transfer to ReAd is not a materially adverse action that can support a retaliation claim.

*Second*, Ms. Swanson argues that her termination on February 24, 1998 also constituted retaliation for her complaints in March 1995 about Mr. Milazzo's evaluation. The fact that the termination was not included in her EEOC charge of retaliation for complaints of gender discrimination charge is not by itself fatal to that claim. The Seventh Circuit has recognized that a retaliation claim may be pursued even if not part of an EEOC charge, if it is based on post-charge developments arising out of the discrimination claim asserted in the charge. *See McKenzie*, 92 F.3d at 481–83; *Steffen*, 859 F.2d at 544–45. However, the Court finds that plaintiff has failed to offer facts sufficient to allow a jury reasonably to find causal connection between her termination and her complaints of gender discrimination in March 1995. Given the significant gap in time between these two events, and the absence of other evidence from which a jury

could draw a "but for" causal link, the Court finds that plaintiff has not satisfied the third prong of the test. *See Merheb v. Illinois State Toll Highway Authority*, No. 98 C. 3190, 2000 WL 198787 (N.D.Illinois, Feb. 10, 2000) (stating that termination one year after filing of discrimination claim and six months after statement by employer that he was "working to get rid" of him, without more, is not enough to show the causal link of retaliatory conduct); *Hoffman–Dombrowski v. Arlington International Racecourse, Inc.*, 83 F.Supp.2d 934 (N.D.Ill.2000) (holding that thirteenth-month gap between complaint of gender discrimination and subsequent adverse employment action of transfer is not sufficient to establish a causal link).

19. There is no small irony that in asserting their conflicting positions on whether Ms. Swanson suffered from a disability, Allstate relies on the opinion of Dr. Lichtenstein (whose assessment Allstate declined to rely upon without additional IMEs) (Def.'s Mem. 14), while Ms. Swanson relies on the opinion of Dr. Conroe (whose assessment she previously rejected) (Pl.'s Mem. 17). In any event, the Court believes that the summary judgment record does create a genuine fact issue as to whether Ms. Swanson was "disabled" at the time she sought to return to work.

The Seventh Circuit has recognized that depression may be—but is not invariably—a disability under the ADA. *Krocka v. City of Chicago*, 203 F.3d 507, 512 (7th Cir.2000); *Schneiker v. Fortis Ins. Co.*, 200 F.3d 1055, 1061 (7th Cir.2000). To establish that depression is a disability in a given case, the plaintiff must demonstrate that "her depression substantially limits her ability to perform a major life activity," *Schneiker*, 200 F.3d at 1061, which can include working. *Murphy v. United Parcel Service, Inc.*, 527 U.S. 516, 522, 119

## A. Allstate Satisfied Its Statutory Duty To Reasonably Accommodate.

Under the ADA, an employer has a duty to offer reasonable accommodations for qualified persons with known physical or mental disabilities, which would allow the employee to continue working, so long as the essential functions of the job are being performed with or without the accommodation, unless the needed and/or requested accommodations would impose an undue hardship on the employer. 42 U.S.C. § 12112(b)(5)(A). *See also Beck v. University of Wisconsin Bd. of Regents,* 75 F.3d 1130, 1135–36 (7th Cir.1996). The ADA's definition of "reasonable accommodation" includes "job restructuring, part-time or modified work schedules, reassignment to a vacant position, ... and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B). However, "an employer is not required to 'bump' other employees to create a vacancy so as to be able to reassign the disabled employee. Nor is an employer obligated to create a 'new' position for the disabled employee." *Gile v. United Airlines, Inc.,* 95 F.3d 492, 499 (7th Cir.1996).

In *Weiler,* the Seventh Circuit explained that a plaintiff's request for reassignment to new supervisors does not obligate an employer to transfer the employee unless there is a vacant position and reassignment would not pose an undue hardship. 101 F.3d at 526 (*citing Gile v. United Airlines, Inc.,* 95 F.3d 492, 499 (7th Cir. 1996)). *Weiler* also held that the ultimate decision whether to transfer an employee remains with the employer and, unless there is evidence showing that the employer unreasonably refused to transfer an employee to a vacant position, a failure to reassign an employee does not violate the reasonable accommodation requirement of the ADA. *See* 101 F.3d at 526 (*citing Wernick v. Federal Reserve Bank of New York,* 91 F.3d 379, 384 (2d Cir.1996)).

There is no evidence that Allstate unreasonably refused to "transfer" Ms. Swanson with respect to which supervisors she would report, or unreasonably refused to allow her to work part time. Rather, the evidence shows that Allstate attempted to ascertain whether these or other accommodations were necessary by requesting

S.Ct. 2133, 144 L.Ed.2d 484 (1999); *Sinkler v. Midwest Property Management, Ltd.,* 209 F.3d 678, 683, (7th Cir., Apr. 6, 2000); *Weiler v. Household Finance Corp.,* 101 F.3d 519, 524 (7th Cir.1996); *but cf. Schneiker,* 200 F.3d at 1060 n. 2 (noting Supreme Court recently has questioned whether working should be considered a major life activity). However, the effect on the ability to work must be far ranging: it is not enough that a condition prevents a person from doing one particular job, or doing it for one particular employer. *Weiler,* 101 F.3d at 524–525. Moreover, the Seventh Circuit has made it clear that a condition that makes it difficult or impossible to work for a particular supervisor does not qualify as a "disability." *Schneiker,* 200 F.3d at 1062 ("a personality conflict between an employee and a supervisor—even one that triggers the employee's depression—is not enough to establish that the employee is disabled, so long as the employee could still perform the job under a different supervisor").

Under these standards, Dr. Lichtenstein's report as well as Ms. Swanson's self-assessment of her condition would establish that she is not disabled: the part-time requirement was not medically necessary, and any inability of Ms. Swanson to work for particular supervisors would not rise to the level of an ADA-disability. But Dr. Conroe's report creates a genuine fact dispute on this score, as his report concluded that Ms. Swanson's depression was profound, was ongoing, and was a serious impediment to her being able to work. While Allstate argues that Dr. Conroe's opinion was limited to Ms. Swanson working at Allstate, a jury would not be required to read that report so narrowly. Dr. Conroe opined that certain aspects of Ms. Swanson's condition would present special obstacles to her returning to Allstate; but his opinion described a general condition that a jury reasonably could conclude would be disabling for Ms. Swanson in any work she attempted to perform as an attorney. However, for the reasons explained below, the fact issue that Dr. Conroe's opinion creates does not allow Ms. Swanson's ADA claim to survive for trial.

plaintiff to undergo a second IME, to resolve the conflict between Drs. Lichtenstein and Conroe. Allstate never completed this process, because Ms. Swanson frustrated Allstate's efforts to ascertain her ability to return to work and the necessary accommodations.

To determine what may constitute a "reasonable accommodation" the employer and the employee typically must engage in an interactive process. *Hunt–Golliday v. Metropolitan Water Reclamation Dist. of Greater Chicago*, 104 F.3d 1004, 1012 (7th Cir.1997) ("determining what specific actions should be taken by an employer requires an interactive process involving participation by both sides"). In *Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130 (7th Cir.1996), the Seventh Circuit explained what the interactive process requires:

> An accommodation is something concrete—some specific action required of the employer. *Siefken v. Village of Arlington Heights*, 65 F.3d 664, 666 (7th Cir.1995) (parenthetical omitted). Therefore, someone, either the employer or the employee, bears the ultimate responsibility for determining what specific actions must be taken by the employer. The employer has at least some responsibility in determining the necessary accommodation. The federal regulations implementing the ADA state:

> > To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

> 29 C.F.R. § 1630.2(*o*)(3)(1995). But the regulations envision an interactive process that requires participation by both parties:

> > [T]he employer must make a reasonable effort to determine the appropriate accommodation. The appropriate accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability.

> 29 C.F.R. pt. 1630, app; *see also Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 677 (1st Cir.1995). . . . *No party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith.* In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility. For example, the cause of the breakdown might be missing information. The regulations envision such a cause:

> > [I]n some instances neither the individual requesting the accommodation nor the employer can readily identify the appropriate accommodation. For example, the individual needing the accommodation may not know enough about the equipment used by the employer or the exact nature of the work site to suggest an appropriate accommodation.

> 29 C.F.R. pt. 1630, app. *Where the missing information is of the type that can only be provided by one of the parties, failure to provide the information may be the cause of the breakdown and the party withholding the information may be found to have obstructed the process.* The determination must be made in light of the circumstances surrounding a given case.

*Id.* at 1135–36 (emphasis added).

Under the standards set forth in *Beck*, responsibility for breakdown of the inter-

active process in this case must be assigned to the Ms. Swanson, who ultimately terminated the interactive process. When Ms. Swanson initiated the process, by refusing to return to work full time and without restrictions after her leave of absence expired, Allstate acted reasonably—both under its own Illness LOA policy and the ADA—by seeking to determine whether Ms. Swanson had a disability and what, if any, accommodations were reasonably required to permit Ms. Swanson to do her job. The gist of Ms. Swanson's complaint in Count III really boils down to the fact that Allstate did not accept Dr. Lichtenstein's initial recommendations to give her part-time hours in a reassigned position. However, Ms. Swanson has not pointed to anything that prohibited Allstate from asking for the first IME, or that shows Allstate was unreasonable in taking that step to ensure that Ms. Swanson would be able to perform the often difficult and sensitive duties of any attorney. *See Place v. Abbott Laboratories*, 215 F.3d 803, 808 (7th Cir.2000) ("in an era when disgruntled workers all too regularly take out their frustrations with a gun, Abbott's desire to get a second opinion before welcoming Place back to work hardly seems unreasonable"). Ms. Swanson plainly has failed to offer facts to create a genuine dispute about the reasonableness of Allstate's proposal for a second IME, once a conflict arose between the statements of Drs. Lichtenstein and Conroe.

Indeed, had Allstate accepted Dr. Lichtenstein's opinion, Allstate would have had no duty to provide the accommodations Dr. Lichtenstein recommended because Dr. Lichtenstein did not offer any medical evidence that Ms. Swanson was disabled. Dr. Lichtenstein and Ms. Swanson both admit the part-time schedule was not medically necessary (Def.'s Facts ¶¶ 128, 134), and the inability to work for a particular supervisor is not a "disability." Without a disability, there is no legal duty of accommodation under the ADA. *Schneiker*, 200 F.3d at 1062. Conversely, if Allstate had accepted Dr. Conroe's opin-

ion, it likewise would have had no duty to accommodate Ms. Swanson, as that opinion indicated that Ms. Swanson was not then able to return to Allstate under any circumstances (Def.'s Facts ¶ 163). Thus, by asking for a second IME, Allstate was proposing a mechanism that could trigger an ADA-duty to reasonably accommodate Ms. Swanson where none at the time existed.

Moreover, there was nothing about the Allstate proposal for the second IME that indicated Allstate was bound and determined to deny Ms. Swanson an opportunity to return to work, or to be reasonably accommodated in doing so. To the contrary: (1) Allstate specifically stated it was "not rejecting Ms. Swanson's request to return to work in any capacity, but simply [is] trying to evaluate whether or not she is fit to do so" (Def.'s Facts, Ex. A(50)); (2) Allstate did not attempt to dictate who could perform the second IME, but proposed that the selection be made jointly by Drs. Lichtenstein and Conroe (Def.'s Facts, ¶ 164); and (3) Allstate agreed in advance to be bound by whatever conclusion was reached in the second IME (*Id.*). This proposal was not a mechanism to put into place a requirement for endless IMEs: Allstate proposed one, final binding IME. That request was entirely reasonable. *See Beck*, 75 F.3d at 1135 ("[t]o determine the appropriate reasonable accommodation it may be necessary for [the employer] to ... identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations. But the regulations envision an interactive process that requires participation by *both* parties ....") (emphasis added).

Rather than agree to the that final IME, Ms. Swanson elected to cut off the interactive process before it was done, and to resort instead to the legal process (Def.'s Facts ¶ 173). That was her choice, of course, but having made it, she cannot complain that Allstate failed to reasonably

**978**

accommodate her. *See Beck,* 75 F.3d at 1136. Although the interactive process need not go on indefinitely before legal action is taken if the process proves to be fruitless, responsibility for a breakdown in the process caused by an employee's unreasonable failure to help the employer determine what specific accommodations are necessary must be assigned to the employee. *Id.* at 1135–36.

 While the "interactive process is not an end in itself," *Rehling v. City of Chicago,* 207 F.3d 1009, 1015 (7th Cir. 2000), it nonetheless is an important means "for determining what reasonable accommodations are available to allow a disabled person to perform the essential job functions of the position sought." *Id.* (*quoting Sieberns v. Wal–Mart Stores, Inc.,* 125 F.3d 1019, 1023 (7th Cir.1997)). In this case, Ms. Swanson's refusal to allow herself to be examined a second time was not reasonable, and frustrated Allstate's legitimate effort to determine whether Ms. Swanson had a disability and what accommodations were necessary to allow her to do her job.[20]

On the facts presented on summary judgment, the Court finds that Ms. Swanson has failed to create a triable issue on the question of whether Allstate reasonably accommodated her alleged disability. As a result, Allstate is entitled to summary judgment on Count III of the amended complaint.

## CONCLUSION

For the foregoing reasons, Allstate's motion for summary judgment (doc. # 61–1)

is granted as to Counts I and III, but denied as to Count II.

---

20. We do not believe the ADA required Allstate to accept Ms. Swanson's proposal of letting her return for a trial period under Dr. Lichtenstein's restrictions (Pl.'s Add'l Facts ¶ 163). "An employer is obligated to provide a qualified individual with a reasonable accommodation, not the accommodation he would prefer." *Rehling,* 207 F.3d at 1014. Moreover, given Dr. Conroe's opinion that Ms. Swanson's impairments rendered her unable to return to work under any circum-

stances, we do not believe a jury could reasonably find that Allstate was required to reassign Ms. Swanson, permanently or temporarily, without receiving further medical assessments. *See Hendricks–Robinson v. Excel Corp.,* 154 F.3d 685, 690 (7th Cir.1998) (reassignment is one form of accommodation but the disabled employee must be qualified for the position to which he or she seeks reassignment).